No. 95-2681

United States of America,           *
                                    *
     Appellee,                      *
                                    *   Appeal from the United States
     v.                             *   District Court for the
                                    *   Eastern District of Missouri.
Lonnie Payne,                       *
                                    *
     Appellant.                     *


                    Submitted:    February 13, 1996

                    Filed:    April 15, 1996


Before MAGILL, HEANEY, and MURPHY, Circuit Judges.


MURPHY, Circuit Judge.


     Lonnie Payne pled guilty to conspiracy to distribute and possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. He was sentenced by the district court[1] to 210 months imprisonment. On appeal, Payne raises several points related to his sentence. He contends that his offense level was improperly increased for possession of a firearm pursuant to § 2D1.1(b)(1) of the Sentencing Guidelines, that the standard of proof in the application note accompanying this section violates due process, and that the district court was unaware of its authority to depart downward from the guidelines. We affirm.

---

[1] The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

In 1993, the St. Louis Police Department received information about a cocaine distribution conspiracy involving Payne and his cousin, Leroy Eason. For the next year, police investigated their activities, conducting numerous surveillances of various residences and monitoring cellular telephone calls between them and other members of the conspiracy.

In his plea agreement,[2] Payne stipulated to the following facts. From May 1, 1994 through October 7, 1994, Payne conspired with Leroy Eason, Raymond Tohill, Anthony Fitzpatrick, and other individuals to distribute large amounts of cocaine in St. Louis, Missouri. Payne and Eason recruited couriers to transport money by car to Los Angeles, California, where Payne and Eason purchased the cocaine. The cocaine was then concealed in a car and driven back to St. Louis by a courier. Payne and Eason retrieved the drugs after they arrived in St. Louis and distributed them to other persons in the area.

Payne further stipulated that Tohill transported money and cocaine between St. Louis and Los Angeles on five completed trips, and was compensated for his role in the conspiracy. During his sixth trip, however, Tohill was stopped on October 4, 1994 for a traffic violation in Las Vegas, Nevada. Police searched the car with Tohill's consent and discovered some twenty four kilograms of

---

[2]In the agreement, Payne agreed to plead guilty to Count I, the conspiracy count, and the government agreed to dismiss Count III, which charged Payne with knowingly using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). Payne stipulated that he understood his sentence would be subject to the Sentencing Guidelines and that both parties could comment on their application. There is no contention that the sentencing enhancement violated the plea agreement, and a conviction on the substantive offense is not necessary for an enhancement. See United States v. Meyers, 990 F.2d 1083, 1086 (8th Cir. 1993).

cocaine. Payne stipulated that this cocaine was destined for himself, Eason, and Fitzpatrick.

Government testimony at a suppression hearing and the sentencing hearing indicated that Tohill's arrest was a major breakthrough in the investigation. According to St. Louis police detective Michael Busalaki, who testified at both hearings, Tohill had told the Nevada authorities that he was scheduled to deliver the cocaine to Eason. He agreed to make a controlled delivery using packages similar to those which had contained the cocaine. He returned to St. Louis on the night of October 6, 1994, and contacted Eason as instructed by the police. Based on their previous surveillances, the police obtained several search warrants that same night for locations where they believed Payne and Eason stored their cocaine. One of these warrants was for an apartment at 1272 Woodchase, which authorities had seen Payne, Eason, and Fitzpatrick enter and leave on various occasions.

Detective Busalaki testified that police observed Eason and Fitzpatrick arrive at Tohill's residence in Lake St. Louis a few minutes after midnight on October 7, 1994. Tohill received payment for transporting the cocaine, and the other two men left in separate cars. Fitzpatrick left first with the packages received from Tohill, and Eason followed. They drove a direct route to within one to one and a half miles of the Woodchase apartment when Eason spotted the police surveillance and contacted Fitzpatrick by cellular phone. Fitzpatrick tried to elude the officers who then stopped and arrested both men.[3] A firearm was found underneath the steering wheel of the car Eason had been driving.

---

[3]At some point, Eason and Fitzpatrick told police that they had been headed to the Woodchase apartment, one of their safe houses for drugs and money. Eason also stated that Payne stayed at the Woodchase apartment with him.

3

Authorities then proceeded to the Woodchase apartment, arriving shortly before 1 a.m. that same morning and entering pursuant to their search warrant. They encountered Payne coming out of the downstairs bedroom into the hallway. He was wearing only pajama bottoms and nothing on his feet. Agent Anthony Piwowarczyk of the Bureau of Alcohol, Tobacco and Firearms seized a loaded Volunteer brand .45 caliber semiautomatic carbine rifle which had been leaning against an open closet door in the downstairs bedroom. He testified at the sentencing hearing that the rifle was visible from the bedroom doorway. Officers also discovered a traffic summons in Payne's name and photographs of Payne on the bedroom dresser. After his arrest, Payne dressed in clothing and shoes from the downstairs bedroom. A search of the rest of the apartment yielded a money counter, rolls of gray duct tape like that wrapped around the cocaine seized from Tohill, and an automatic handgun underneath a mattress in the upstairs bedroom.

Several other search warrants were executed that same day at locations that Payne and Eason reportedly used to store drugs. Authorities recovered a firearm at three of these locations.

The district court determined that Payne had actually or constructively possessed, either solely or jointly with others, the rifle seized by authorities in the downstairs bedroom at the Woodchase apartment. It then enhanced Payne's sentence two levels for possession of a firearm during a drug trafficking offense pursuant to Guideline § 2D1.1(b)(1).

Payne requested a downward departure from the guidelines on the basis that his criminal history category overstated the seriousness of his past behavior. The presentence report (PSR) had calculated his history as Category II based on two adult convictions for possession of a controlled substance and driving with a suspended license. After hearing arguments from both parties, Judge Limbaugh stated that under all of the circumstances,

4

including "the comments of counsel, and the entire file in this matter, together with the provisions in the report of the probation officer," a downward departure was not appropriate.

Payne now appeals the two-level enhancement of his sentence and the refusal to depart downward.

## II.

Federal Sentencing Guideline § 2D1.1(b)(1) provides for an increase of two levels to a person's base offense level for certain drug-related crimes "[i]f a dangerous weapon (including a firearm) was possessed." Application Note 3 explains that the enhancement reflects the "increased danger of violence when drug traffickers possess weapons," and states that the adjustment "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." The burden lies on the government to prove by a preponderance of the evidence both that "the weapon was present and that it is at least probable that the weapon was connected with the offense." United States v. Hayes, 15 F.3d 125, 127 (8th Cir.), cert. denied, 114 S.Ct. 2718 (1994). The district court's finding that a defendant possessed a firearm for purposes of § 2D1.1(b)(1) may only be reversed if clearly erroneous. Id.

Payne argues that the government failed to prove that he possessed the firearm. He claims there was no proof he owned or even knew about the semiautomatic rifle, that his fingerprints were not found on the rifle, and that the Woodchase apartment was leased in Eason's name.

Ownership of either the weapon or the premises on which it is found is not required for a § 2D1.1(b)(1) enhancement. See United States v. Weaver, 906 F.2d 359, 360 (8th Cir. 1990). It is not necessary that an individual be observed using the weapon, and

5

either actual or constructive possession is sufficient, i.e., the individual must have exercised "ownership, dominion, or control" either over the firearm or the premises on which it is found. See United States v. Luster, 896 F.2d 1122, 1129 (8th Cir. 1990).

At the time the officers entered the Woodchase apartment, Payne was alone in it and was observed coming out of the downstairs bedroom in which the semiautomatic rifle was found in a visible location. Although the apartment was leased under Eason's name and there were two bedrooms, Eason had told authorities that Payne lived there, and agents had seen Payne enter it before. Payne's pictures, personal papers, and clothing were all found in the downstairs bedroom. See Hayes, 15 F.3d at 127 (pictures of defendant in locker containing weapons was evidence of constructive possession over the locker); see also Weaver, 906 F.2d at 360 (defendant had constructive possession of weapon in another bedroom of the apartment). Based on this evidence, the court did not err in finding that Payne had possession over the firearm in the downstairs bedroom.

Payne next contends that there was no connection between the rifle and his charged offense. He claims that no spatial nexus existed because no drugs were found in the Woodchase apartment and no temporal nexus existed because the government did not show he had recently committed any drug-related activity there.

The government can prove that the weapon was connected with the offense by showing that "a temporal and spacial relation existed between the weapon, the drug trafficking activity, and the defendant." United States v. Bost, 968 F.2d 729, 732 (8th Cir. 1992). Here, the crime that Payne pled guilty to was conspiracy to distribute and possess with intent to distribute in excess of five kilograms of cocaine. In order to establish a nexus, therefore, the government had to prove by a preponderance of the evidence that the weapon was found in the same location where drugs or drug

6

paraphenalia were stored, or where part of the conspiracy took place. See id.

The government presented evidence that the Woodchase apartment was a location related to a drug distribution conspiracy in which Payne was involved. Payne stipulated that he conspired with Tohill, Eason, and Fitzpatrick to distribute cocaine, that Tohill made several round trips between Los Angeles and St. Louis transporting cocaine and money in furtherance of the conspiracy, and that the twenty four kilograms of cocaine seized from Tohill's car was to be delivered to him, Eason, and Fitzpatrick. Authorities observed Eason and Fitzpatrick drive in the direction of the Woodchase apartment after they picked up what was packaged like the original cocaine. Because of an unexpected turn of events, they were intercepted approximately one mile from the apartment after they spotted the surveillance. Authorities had previously observed Payne and other members of the conspiracy enter and leave the Woodchase apartment on different occasions, and found Payne there with a loaded semiautomatic rife in his possession within an hour of Tohill's delivery to Eason and Fitzpatrick. This was sufficient evidence to establish a temporal nexus between the rifle and the conspiracy to distribute cocaine.

The government also established a sufficient spatial nexus. Although drugs were not found at the Woodchase apartment, Officer Busalaki testified that police recovered a quantity of money and several items of drug paraphernalia, including a money counter and duct tape similar to that wrapped around the cocaine seized from Tohill. This evidence corroborates Eason's statement that he and Payne used the Woodchase apartment to store and package drugs for distribution and to count the proceeds. See Hayes, 15 F.3d at 127 (grinder, baggies, and digital scale stored in locker supported finding that locker related to drug-activity). Payne had also stipulated that he was involved in a conspiracy to distribute cocaine in the St. Louis area over a five month period.

7

These factual circumstances distinguish this case from those that Payne cites. In United States v. Shields, 44 F.3d 673, 674 (8th Cir. 1995), and United States v. Khang, 904 F.2d 1219, 1220-21 (8th Cir. 1990), the government stipulated that the firearms there had no relationship to the crime, a crucial fact not present here. Moreover, in Shields the firearms were not seized until thirty seven days after the last known drug transaction, and in Khang the defendant had purchased the weapon years before to protect his family against violence in their housing project. In contrast, Payne was discovered in possession of the rifle within the hour that Tohill turned over the packages for distribution. As Officer Busalaki testified, it is well recognized that firearms such as the semiautomatic rifle found in Payne's room are tools of the drug dealer's trade. See United States v. Turpin, 920 F.2d 1377, 1387, cert. denied, Williams v. U.S., 499 U.S. 953 (1991); accord Hayes, 15 F.3d at 127. There was thus ample evidence connecting the rifle to the charged drug conspiracy.

Finally, Payne contends that the "unless clearly improbable" standard of proof violates the due process clause of the Fifth Amendment. Since Payne concedes that he did not raise this claim in the district court, he has failed properly to preserve the issue for appeal. See United States v. White, 890 F.2d 1033, 1034 (8th Cir. 1989) (claim as to constitutionality of sentencing enhancement statute not raised below was not properly before appellate court); accord Bost, 968 F.2d at 734 n.4.

Payne's due process claim would not succeed in any event. He does not claim he was deprived of procedural due process safeguards required in sentencing hearings: representation by counsel and an opportunity to be heard, cross-examine witnesses, and present evidence. See United States v. Luster, 896 F.2d 1122, 1129 (8th Cir. 1990) (holding that use of § 2D1.1(b)(1) did not violate defendant's due process rights where these safeguards were satisfied). Rather, he argues that the "clearly improbable"

8

standard in the application note to § 2D1.1(b)(1) permits enhancement on "a mere modicum of evidence," and that the government should be required to show by a preponderance of the evidence that the weapon is connected to the offense.

The suggested preponderance standard is already required in this circuit, and the government presented sufficient evidence to meet its burden of proof. See Hayes, 15 F.3d at 127. The "unless clearly improbable" language does not shift the burden of proof to the defendant; the government must prove by a preponderance of the evidence that the weapon is connected to the offense. See Khang, 904 F.2d at 1223 n.7. Here, two government agents testified at the sentencing hearing that the rifle was found in an apartment used by the conspirators to store cocaine and drug proceeds. Eason told authorities that he and Payne used the apartment for this purpose, and Payne stipulated that he was a member of the conspiracy to possess and distribute cocaine. A money counter and a quantity of money were found at the apartment where Payne was seen close to the rifle near the time when the attempted drug delivery was en route.

This evidence was sufficient to satisfy the preponderance burden of proof, and the imposition of the § 2D1.1(b)(1) enhancement was therefore not based on an improper presumption or mere modicum of evidence. See United States v. Stewart, 926 F.2d 899, 900-01 (9th Cir. 1991) (§ 2D1.1(b)(1) does not create an improper presumption that the enhancement should apply); accord United States v. Durrive, 902 F.2d 1221, 1230-31 (7th Cir. 1990); United States v. McGhee, 882 F.2d 1095, 1097-99 (6th Cir. 1989).

**III.**

Payne also claims that he was entitled to a downward departure from the sentencing guidelines pursuant to § 4A1.3 because Criminal History Category II overstated his prior criminal record.

9

A district court may depart downward from the applicable guidelines range where "a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history." U.S.S.G. § 4A1.3. For example, departure from Category II may be appropriate for a defendant with two minor misdemeanor convictions close to ten years prior to the instant offense who has no other evidence of prior criminal behavior in the intervening period. Id. This court has jurisdiction to review a refusal to depart downward under § 4A1.3 only where the sentencing court was unaware of its authority to depart. See United States v. Hall, 7 F.3d 1394, 1396 (8th Cir. 1993).

The presentence report (PSR) specifically addressed the appropriateness of a downward departure under § 4A1.3. It noted that Payne had two serious juvenile offenses which had not been counted, that his adult conviction for possession of a controlled substance was similar to the instant offense, and that he had an outstanding warrant for violating probation on his second adult conviction for driving with a suspended license in March 1994. The PSR concluded that Category II "does not overstate the seriousness of the defendant's criminal record" and "that there is a likelihood that the defendant will commit further crimes." It found "no downward departure issues in this case."

At the sentencing hearing, the court heard arguments from both parties as to whether it should depart downward. Payne's counsel described Payne as a young man with only two municipal ordinance violations. The government pointed out that Category I was only appropriate for individuals with either no criminal record or only a minor blemish, whereas Payne had a total of four criminal incidents, two of which had involved narcotics.

Judge Limbaugh then indicated that he would not depart downward based on an insufficient showing that such a departure was warranted. He first stated that he had considered the "comments of

10

counsel, and the entire file in this matter, together with the provisions in the report of the probation officer." Sent. Tr. at 74. He then concluded that "I am going to determine that under all of the circumstances in this case that it is inappropriate for the Court to depart downward in this matter." Id.

In the course of his comments, Judge Limbaugh also noted that "even if I were inclined to [depart], I am not certain that I have the actual authority to." Id. at 74-75. Payne suggests that this comment means Judge Limbaugh did not know he had the authority to depart. Since Payne did not raise any question or comment about this statement at the hearing, Judge Limbaugh did not have the opportunity to expand on his full meaning. The overall context of the judge's statements, however, indicates that he was aware of his authority to depart, but chose not to do so based on the merits of Payne's request, concluding that departure was inappropriate based on "all of the information" before him. We therefore lack jurisdiction to review the decision to depart downward. See Hall, 7 F.3d at 1396.

Accordingly, the judgment and sentence are affirmed.

A true copy.

        Attest:

            CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

11