# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1588

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri |
| James F. Atkins, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  November 15, 2000

Filed:  May 30, 2001

_____

Before WOLLMAN, Chief Judge, and McMILLIAN and BYE, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

James F. Atkins appeals from a final judgment entered in the United States District Court[1] for the Western District of Missouri sentencing him to 150 months imprisonment and 4 years of supervised release, after he plead guilty to one count of conspiracy to manufacture and distribute methamphetamine, 21 U.S.C. §§ 846,

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

841(a)(1), (b)(1)(B),[2] and one count of aiding and abetting others in possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1), (b)(1)(C). See United States v. Atkins, No. 00-1588WMKC (W.D. Mo. Feb. 16, 2000) (judgment). For reversal, Atkins argues that, upon determining his offense level, the district court improperly calculated the quantities of drugs which could be attributed to him and that it incorrectly applied a firearm enhancement. For the reasons set forth below, we affirm the judgment of the district court.

Jurisdiction in the district court was proper based upon 18 U.S.C. § 3231. Jurisdiction in this court is proper based upon 18 U.S.C. § 3742(a). The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(b).

---

[2]21 U.S.C. § 846 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 841 provides in pertinent part:

**(a) Unlawful Acts**

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally -

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

## Background

The following facts are based upon the evidence presented at Atkins's sentencing hearing and findings of the presentence investigation report ("PSR"), to which Atkins refers in his brief to this court, unless otherwise stated. On September 13, 1997, Sterling Shiflett and his wife were arrested for narcotics violations pursuant to a traffic stop of their vehicle. The next day, during a search of the Shiflett residence, police recovered items relating to a methamphetamine laboratory. During the fall of 1997, James Deal purchased methamphetamine from Sterling Shiflett and sold it to Bobby Ware, Shirley Holtzclaw, Dennis Schreckhise, and others. In early spring 1998, Deal introduced Sterling Shiflett to Schreckhise, and Shiflett met with Schreckhise and Mike Atkins, brother of James Atkins, to teach them to manufacture methamphetamine according to his method. Mike Atkins and Schreckhise first "cooked" methamphetamine at several locations in Excelsior Springs, Missouri, and then moved to a motel in Kearney, Missouri, in July 1998. Mike Atkins was arrested in July 1998, when he attempted to remove lab items from a friend's house. A search of Mike Atkins revealed methamphetamine, a snorting straw, and a key to the motel room in Kearney, where he and Schreckhise manufactured methamphetamine; a search of the motel room revealed a clandestine methamphetamine laboratory and a quantity of methamphetamine. As a result of charges against him, Mike Atkins began cooperating with authorities.

Also, in July 1998, Schreckhise manufactured methamphetamine at a residence in Kansas City, Missouri. Then, in late July, Schreckhise moved his methamphetamine manufacturing operation to a residence in Liberty, Missouri, and began "cooking" on a regular basis at this residence, along with the help of James Atkins, Mike Atkins, James Deal, Bobby Ware, and Shirley Holtzclaw. Mike Atkins

estimated that he participated in at least five "cooks" at this residence, during which approximately 42 grams of methamphetamine were manufactured on each occasion.

On September 1, 1998, police recovered amphetamine, ephedrine, and a glass crack pipe from a motel room registered to Mike Atkins in Kansas City, Missouri. Subsequently, when Mike Atkins exited from a store adjoining the motel, he was arrested. James Atkins, Schreckhise, Ware, and others were with Mike Atkins at the time of his arrest. James Atkins was not arrested at this time. Also, on September 1, 1998, police recovered, from the trash at Schreckhise's residence, items used to manufacture methamphetamine and a warrant was obtained to search his house. That evening, the Liberty, Missouri, Police Department conducted a traffic stop of Schreckhise's car, in which James Atkins was a passenger. During the stop, the officers recovered a .25 caliber handgun concealed in a compartment in the driver's side door and Schreckhise's day planner, which contained formulas for manufacturing methamphetamine. Schreckhise was arrested for possession of a concealed weapon. James Atkins was arrested and released for having an open container in the car.

The following day, September 2, 1998, officers executed a search warrant at Schreckhise's residence; no laboratory or drugs were found, although a police scanner and various drug paraphernalia were present. James Atkins and others, including Ware, were at the residence at the time of the search. They were not arrested. In mid-September 1998, Schreckhise moved to a camper located in Turney, Clinton County, Missouri, next to a camper which James Atkins's mother owned and where he lived. Schreckhise began manufacturing methamphetamine at his camper with the assistance of James Atkins.

After his arrest in September 1998 for possession of and attempt to manufacture methamphetamine, Mike Atkins informed police that Schreckhise and others occasionally manufactured methamphetamine at National Additives grain mill, where Deal was employed. Based on this information, on October 10, 1998, Clay County deputies began observing the activities at National Additives and, on the evening of

October 19, 1998, they observed James Atkins, Schreckhise, and Deal arrive at the building and leave after spending only a few minutes. Police stopped Schreckhise's vehicle, which was occupied by Schreckhise and James Atkins. They found Schreckhise's day planner which contained ratios for the manufacture of methamphetamine, ziplock baggies and a scanner programmed with police frequencies. Forty-nine grams of methamphetamine in a plastic baggie and items used to manufacture methamphetamine were recovered from inside National Additives.

In late November 1998, Schreckhise was burned during a methamphetamine cook and James Atkins took him to the hospital. As a result of his burns, Schreckhise was incapacitated for a period, during which Deal visited Schreckhise in his camper. While there, he and James Atkins cooked methamphetamine at Schreckhise's direction.

Sometime between November 1998, and January 1999, James Atkins and Schreckhise had a falling out and Atkins ceased his involvement in Schreckhise's drug manufacturing activities. On December 29, 1998, Schreckhise was arrested after a traffic stop in Excelsior Springs, Missouri, during which a clandestine methamphetamine laboratory was found in the trunk of his car. Also, on that date, officers recovered a firearm from Schreckhise's vehicle. Then in December or January 1999, James Atkins and Schreckhise moved from Turney, Missouri, to a campground in Dallas County, Missouri. On January 10, 1999, Sterling Shiflett was arrested after a search of his van revealed a quantity of methamphetamine packaged for sale. Then on January 20, 1999, Schreckhise, Holtzclaw and her husband were arrested after Schreckhise asked Ware, now a cooperating individual, to purchase pseudoephedrine for him and pick up lab equipment and bring it to Holtzclaw's residence.

On March 2, 1999, James Atkins was indicted along with Dennis Schreckhise, Sterling Shiflett, Bobby Ware, James Deal, and Shirley Holtzclaw for conspiracy to manufacture and distribute methamphetamine between September 1, 1997, and January 21, 1999, in violation of 21 U.S.C. § § 846, 841(a)(1) and (b)(1) (B). James Atkins,

Schreckhise, Shiflett, and Deal were also indicted for aiding and abetting each other in the possession of methamphetamine with intent to distribute on October 19, 1998, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

James Atkins pled guilty to both counts of the indictment without any agreement with the government. After accepting Atkins's plea, the district court directed the probation officer to prepare a preliminary PSR, to which Atkins filed objections. As a result of Atkins's objections, changes were made to the preliminary PSR, including a reduction in Atkins's criminal history category from V to III and a change in the stated date of Atkins's entry into and participation in the conspiracy. The PSR was changed to state that Atkins entered into the conspiracy in August 1998 and participated until December 1998.

The PSR recommended that Atkins be held responsible for all quantities that were within the scope of the conspiracy from August 1998 through December 1998, and that Atkins be held responsible for all acts that he committed, aided, or abetted as well as all reasonably foreseeable acts of others in furtherance of the jointly undertakencriminal activity.[3] The PSR concluded that the amount of the actual

---

[3]U.S.S.G. § 1B1.3(a) states in relevant part:

Unless otherwise specified, (i) the base offense level where the guidelines specifies more than one base offense level . . . shall be determined on the basis of the following:

(1)    (A) all acts and omissions committed, aided . . . or willfully caused by a defendant; and

    (B) in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.

seizures[4] grossly underestimated the amount of methamphetamine for which James Atkins was responsible and recommended that the drug quantity be based on the statements of cooperating co-defendants, including Deal, and Ware.[5] Based on their estimates, the PSR concluded that during the time period from August 1998 until December 1998, the most conservative estimate of the amount of methamphetamine produced by Schreckhise was 77 grams per week.[6] It further concluded that Atkins

---

[4]To calculate the actual quantities of methamphetamine, the report used seizures of July 9, 1998 (120.2 kilograms of marihuana, September 15, 1998, (157.38 kilograms of marihuana), September 15, 1998 (186.5 kilograms of marihuana), and October 19, 1998 (99 kilograms of marihuana), for a total of 563.08 kilograms of marihuana. Because there were different substances involved in the offenses, the PSR converted them to marihuana pursuant to the drug equivalency tables of U.S.S.G. § 2D1.1.

[5]U.S.S.G. § 2D1.1, Note 12 states:

Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved. If the offense involved both a substantive drug offense and an attempt or conspiracy . . . the total quantity involved shall be aggregated to determine the scale of the offense.

[6]The PSR calculated that James Deal's estimate suggested Schreckhise manufactured approximately 300 grams per week and that Bobby Ware's estimate suggested that Schreckhise manufactured 85 grams per week. Additionally, the PSR considered that a cooperating co-defendant reported that Schreckhise distributed approximately an average of 52.5 grams weekly to Ware, Deal, Mike Atkins, James Atkins, Shirley Holtzclaw, and other co-defendants, and that Schreckhise himself admitted using 24.5 grams per week, for a total of 77 grams per week. The PSR reasoned that 77 grams per week was both a conservative and reasonable estimate of

was responsible for this rate of manufacture for the 18 weeks from August 1998 until mid- December 1998,[7] for a total of 1,386 grams, or 1.386 kilograms. The PSR noted that U.S.S.G. § 2D1.1 specifies a base offense level of 32 for more than 500 grams, but not less than 1.5 kilograms, of methamphetamine.

The PSR recommended a two-level enhancement for possession of a firearm by a co-conspirator, Schreckhise, pursuant to U.S.S.G. § 1B1.3(a)(1)(B) and § 2D1.1(b). Section 1B1.3(a)(1)(B) provides that in the case of a conspiracy, specific offense characteristics shall be determined by reasonably foreseeable acts of others in furtherance of the jointly undertaken criminal activity. Section 2D1.1(b) states that if a "dangerous weapon (including a firearm) was possessed," the base offense level should be increased by two levels. The PSR concluded that the weapons recovered from Schreckhise's vehicle in September and December 1998 were both reasonably forseeable and were possessed in furtherance of the conspiracy to manufacture and distribute methamphetamine. The PSR further noted that Shirley Holtzclaw reported that Schreckhise always carried a gun. Therefore, the PSR recommended a two-level enhancement to the base offense level of 32, for an offense level of 34.

Additionally, the PSR made a downward adjustment of two levels for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), and a further downward adjustment of one level pursuant to U.S.S.G. § 3E1.1(b)(2), because the base offense level is greater than 16 and because Atkins notified the authorities in a timely fashion of his intention to enter a plea of guilty. Thus, the PSR recommended a total offense level of 31.

the methamphetamine for which James Atkins was responsible.

[7]This calculation of 18 weeks included 4 weeks each for September, October and November, and 3 weeks each for August and December.

Atkins filed objections to the PSR. In particular, Atkins said he was not involved with the manufacture or distribution of methamphetamine after late November or early December 1998. He further disagreed with the drug quantities but conceded that the quantity for which he was responsible was approximately 45 grams per week and suggested he be held responsible for a total of 495 grams, with a corresponding base offense level of 30. He further said that his estimate of 45 grams of methamphetamine per week is consistent with the actual or tangible amounts outlined in the PSR.

Atkins also objected to the enhancement for the possession of firearms by Schreckhise because he was not aware that Schreckhise had a firearm on September 1, 1998, when Schreckhise was arrested at a traffic stop for possession of a concealed weapon. Atkins further stated that there was no evidence, other than the statement of a co-conspirator, that he possessed any weapons in his camper; even if weapons were there, Atkins contended that there is no evidence they were related to drug activities. Based on these assumptions, Atkins concluded that his total offense level should have been 27, his criminal history category II,[8] resulting in a sentencing range of 78 to 97 months.

On February 2, 2000, the district court conducted a sentencing hearing at which Ware and Deal testified. Deal testified that in July through September of 1998, he observed Schreckhise and others, including James Atkins, cooking at a residence in Liberty, Missouri, "on an average of a couple times a week." Sentencing Transcript at 54. Deal testified that the yield of a cook was around seven to eight "eight balls;" an eight ball is 3.5 grams. See id. at 52-55. Ware testified that he saw Schreckhise, at the Liberty residence, cook once a week in July and August of 1998, producing about 28 grams each cook, but that he believed that Schreckhise cooked more than once a week.

---

[8]The PSR attributed 6 criminal history points and a criminal history category of III to Atkins.

In August 1998, Ware testified that he saw James Atkins at the Liberty residence twice a week. Ware also testified that from the end of September 1998 to the beginning of November he visited the Turney campground where Schreckhise moved and observed Schreckhise manufacturing methamphetamine with the help of Atkins. Ware estimated that during this period he observed Schreckhise cook at least 28 grams once a week. See id. at 27-32.

A drug enforcement officer testified that, according to Ware's testimony, Ware actually witnessed the manufacture of 392 grams of methamphetamine, based on 28 grams per cook. See id. at 82. The officer further testified that, according to Deal's testimony, Schreckhise would have manufactured, conservatively, 800 grams from July 1998 through November 1998. See id. at 83. The officer also testified that Shirley Holtzclaw provided information that she purchased two to three "eight balls" of methamphetamine a week from Schreckhise over from August through November of 1998. The officer further testified regarding the weapon which was recovered during the traffic stop of Schreckhise's vehicle on September 1, 1998, and the day planner containing formulas for the manufacture of methamphetamine. See id. at 77-78. The officer also testified that on this same date, during another traffic stop, Ware reported that he was on his way to a campground in Turney to meet with James Atkins. The officer further testified regarding another traffic stop of Schreckhise's vehicle on October 19, 1998, in which James Atkins was again present with Schreckhise. Items recovered from this second traffic stop included a police scanner, radio frequency guides, vehicle descriptions, and a day planner. See id. at 76-78.

After hearing this testimony, the district court ruled that the PSR correctly determined that the drug quantity was between 500 and 1,500 grams of methamphetamine. See id. at 94-95.[9] The district court ruled that a two-level

_____

[9]Upon making its ruling, the district court stated:

enhancement for the possession of a weapon was applicable because Atkins was "in close enough association" with Schreckhise, he "was aware of the fact that [Schreckhise] was in possession of the firearms," and, given the evidence presented, it was reasonably foreseeable "that the weapons were possessed in furtherance of the conspiracy to manufacture and distribute methamphetamine." Id. at 89. The district court held that Atkins's total offense level was 31 and his criminal history category was III, and sentenced Atkins to 150 months imprisonment on both counts against him, to be served concurrently, with supervised release for 4 years.[10] See id. at 100. Atkins timely appealed, arguing that the district court improperly calculated the quantity of drugs for which he was responsible and that it incorrectly applied the firearm enhancement.

## Discussion

Quantity of drugs and the base offense level

James Atkins argues on appeal that the district court erred in determining the quantity of drugs attributable to him and in determining the applicable base offense level. He further argues that he should be held responsible for less than 500 grams of methamphetamine, noting that he conceded at his sentencing hearing that he assisted

---

> I believe the evidence establishes that the base offense level was correctly calculated [by the PSR] and that the level of drugs involved [was] over five hundred grams. I believe that was established by the testimony of Mr. Ware as well as the testimony of Mr. Deal in this matter that I found to be credible and reliable.

Sentencing Transcript at 87.

[10]The district court said that its sentencing options were 135 to 168 months in custody and 4 to 5 years supervised release; probation was not authorized. Options also included $15,000 to $2,000,000 in fines.

in the production of a total of 495 grams, resulting in a base offense level of 30. Atkins asserts that this quantity is consistent with the tangible quantities recovered through seizures and the quantities estimated by Ware. See Brief for Appellant at 26-29. Atkins contends that the district court should not have given the same weight to the testimony of Deal as was given to that of Ware, because Deal witnessed fewer cooks than did Ware and, therefore, his testimony was based on speculation. See id.

The correct application of the sentencing guidelines is a question of law subject to *de novo* review. See United States v. Collins, 104 F.3d 143, 144 (8th Cir. 1997). However, we review a sentencing court's findings of fact regarding the quantity of drugs attributed to a defendant for clear error. See United States v. Maggard, 156 F.3d 843, 848 (8th Cir. 1998), cert. denied, 526 U.S. 1058 (1999). The quantity of drugs is an issue for the sentencing judge; the government must prove the quantity of drugs attributed to a defendant by a preponderance of the evidence. See Maggard, 156 F.3d at 847-48 (citing United States v. Padilla-Pena, 129 F.3d 457, 467 (8th Cir. 1997)); United States v. Candie, 974 F.2d 61, 64 (8th Cir. 1992). Additionally, the district court is required to make findings of fact and rule on unresolved objections to the PSR, which the district court did in this matter. See Candie, 974 F.2d at 64. Also, a district "court may rely solely upon a presentence report for findings relevant to sentencing only if the facts in the presentence report are not disputed by the defendant." United States v. Hammer, 3 F.3d 266, 271 (8th Cir. 1993) (quoting United States v. Streeter, 907 F.2d 781, 791-92 (8th Cir. 1990) and citing United States v. Fortier, 911 F.2d 100 (8th Cir. 1990)).

For a drug offense, the base offense level is determined by the quantity of illegal drugs attributable to the defendant. See U.S.S.G. § 2D1.1(c); Candie, 974 F.2d at 64. A base offense level is determined by all acts "that occurred during the commission of the offense of conviction," here, a conspiracy. U.S.S.G. § 1B1.3(a)(1)(A) and (B). This court holds that when a conspiracy is involved, a determination of the drug quantity at sentencing is as follows:

A defendant convicted of conspiracy is properly held accountable for all reasonably foreseeable acts and omissions of any co-conspirator taken in furtherance of the conspiracy. Thus, in a drug conspiracy, the district court may consider amounts from drug transactions in which the defendant was not directly involved, provided that those other dealings were part of the same course of conduct or scheme. Before a quantity of drugs may be attributed to a particular defendant, the sentencing court is required to find by a preponderance of the evidence that the transaction or activity involving those drugs was in furtherance of the conspiracy and either known to that defendant or reasonably foreseeable to him.

United States v. Brown, 148 F.3d 1003, 1008 (8th Cir. 1998), cert. denied, 525 U.S. 1169 (1999). Additionally, U.S.S.G. § 2D1.1, comment, n. 12, gives the court the authority to approximate the quantity of drugs where there is no seizure or where the amount seized does not reflect the scale of the offense.

Pursuant to the standard set forth in Brown, 148 F.3d at 1008, the district court correctly considered drug transactions in which Atkins may not have been directly involved. Not only did Atkins plead guilty to conspiracy to manufacture and distribute methamphetamine, but his co-conspirators provided information regarding drug transactions which were part of the conspiracy. In reaching its factual conclusions, the district court made the specific findings required by Brown that the drug-related activities attributed to Atkins were "in furtherance of the conspiracy and either known to [him] or reasonably foreseeable to him." Id. See also United States v. Davidson, 195 F.3d 402, 410 (8th Cir. 1999), cert. denied, 529 U.S. 1093 (2000) (a defendant in a drug conspiracy is responsible for all contraband within the scope of the criminal activity and reasonably foreseeable to him).

Additionally, Fed. R. Crim. P. 32 provides that where a defendant challenges the factual accuracy of the information contained in the PSR, the district court shall, "as to each matter controverted, make (i) a finding as to the allegation or (i) a determination that no such finding is necessary because the matter controverted will not

be taken into account."   The Sentencing Guidelines provide that in resolving such disputes, the court may consider any relevant information that "has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3.

As stated above, in reaching its conclusion regarding the quantity of methamphetamine attributable to Atkins, the district court relied on the testimony of co-conspirators Deal and Ware regarding the activities of the conspiracy.  Pursuant to Deal's testimony, the court could have arrived at a figure far in excess of 500 grams.  Although Ware testified to the production of arguably a smaller amount of methamphetamine, according to the explanation of the drug enforcement officer, Ware defined "cook as the actual process of hydriotic acid and ephedrine and red phosphorous under heat," while Deal "expanded that definition to any part of the process which is more consistent with what [the officer] would use."  Sentencing Transcript at 83.  After hearing this testimony, the district court chose to adopt the recommendation in the PSR that Atkins should be held responsible for 77 grams a week for 18 weeks.

A district court has wide discretion at sentencing as to the kind of information considered or its source.  See United States v. Johnson, 767 F.2d 1259, 1276 (8th Cir. 1985).  The court's inquiry upon sentencing is "'largely unlimited either as to the kind or information [it] may consider, or the source from which it may come.'"  Id. (citing Tucker v. United States, 404 U.S. 443, 446 (1972)).  Moreover, the court may consider criminal activity for which the defendant has not been prosecuted and "uncorroborated hearsay, provided the [defendant is] given a chance to rebut or explain it."  Id. (citing United States v. Ray, 683 F.2d 1116, 1120 (7th Cir. 1982)).  Additionally, the testimony of  co-conspirators is sufficient evidence on which the court may base the quantity of drugs used for sentencing.  See United States v. Phillippi, 911 F.2d 149, 151 n.3 (8th Cir. 1990).  In reaching its conclusion, the district court assessed and provided Atkins with an opportunity to challenge testimony of cooperating co-conspirators and a drug enforcement officer, and the recommendation of the PSR.  We

-14-

further note that "the sentencing court's assessment of the credibility of witnesses is nearly unreviewable." United States v. Dierling, 131 F.3d 722, 736 (8th Cir. 1997). See also United States v. Alatorre, 207 F.3d 1078, 1079 (8th Cir. 2000).[11] We hold that the testimony supports the district court's finding that Atkins was responsible for the production of more than 500 grams of methamphetamine. We, therefore, hold that the district court did not clearly err in its calculation of the quantity of drugs attributable to Atkins for the purpose of determining his base offense level.

Enhancement based on possession of a firearm by a co-conspirator

Atkins next argues on appeal that the district court erred in enhancing his base offense level based on the possession of a firearm by Schreckhise. A district court's

[11]Pursuant to Fed. R. App. P. 28(j), James Atkins directed this court's attention to three decisions which he believes are pertinent to issues in this matter since the issuance of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000). See Letter from Appellant (Nov. 3, 2000) (citing United States v. Aguayo-Delgado, 220 F.3d 926 (8th Cir. 2000), cert. denied, __ U.S. __, 121 S. Ct. 600 (2000), United States v. Rebmann, 226 F.3d 521 (6th Cir. 2000), and United States v. Walker, 228 F.3d 1276 (11th Cir. 2000), cert. denied, __ U.S. __, 121 S.Ct. 14 (2001)). Atkins does not assert the basis upon which he contends these cases are pertinent. However, we note that both Aguayo-Delgado and Rebmann involve application of the rule in Apprendi that "[o]ther than the fact of prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Aguayo-Delgado, 220 F.3d at 932 (citing Apprendi, 120 S. Ct. at 2355). See also Rebmann, 226 F.3d at 524. Because Atkins does not assert on appeal that he received a sentence beyond the statutory maximum but rather contests the method by which the court calculated the drug quantity for which he was responsible, we find that Aguayo-Delgado and Rebmann do not address the issues under consideration in this matter. Additionally, Walker is not on point to the issues raised by Atkins in his appeal; in Walker the Eleventh Circuit held that because Walker plead guilty and accepted the contents of the presentence investigation, he lost any right to appeal on the basis of Apprendi's aforementioned requirement. See Walker, 228 F.3d at 1278 n.1.

finding that a defendant possessed a firearm for purposes of § 2D1.1(b)(1) may only be overturned if clearly erroneous. See United States v. Payne, 81 F.3d 759, 763 (8th Cir. 1996). However, at sentencing, "[t]he government bears the burden of proving by a preponderance of the evidence that [a firearm] was present and that [it] was probable that it was connected with the drug charge." United States v. McCracken, 110 F.3d 535, 541 (8th Cir. 1997) (citing Payne, 81 F.3d at 763). "Lack of proof of use or actual possession" does not preclude a § 2D1.1(b)(1) adjustment; constructive possession is sufficient. Id. Additionally, "ownership of either the weapon or the premises upon which the weapon is found is not required." Payne, 81 F.3d at 762. Therefore, the fact that Atkins did not own the firearms recovered from Schreckhise's car does not defeat an upward adjustment pursuant to § 2D1.1(b)(1) based on the recovery of this firearm.

The government can meet its burden of proof for purposes of a § 2D1.1(b)(1) enhancement by establishing that "a temporal and spacial relation existed between the weapon, the drug trafficking activity, and the defendant." Id. at 763 (citing United States v. Bost, 968 F.2d 729, 732 (8th Cir. 1992)). The crimes to which Atkins plead guilty were conspiracy to manufacture and distribute methamphetamine and aiding and abetting with others in possession of methamphetamine with intent to distribute. Therefore, in order to establish a nexus between these drug-related activities and the firearm, the government had to prove by a preponderance of evidence that the firearm was found in the same location where drugs or drug paraphernalia were located or where part of the conspiracy took place. See id.

During the sentencing hearing, a drug enforcement officer, who worked on the investigation of Atkins, Ware, Deal and others, testified regarding the traffic stop of Schreckhise's vehicle on September 1, 1998. See Sentencing Transcript at 73-87. The officer testified that Atkins was present in the vehicle and that not only were a .25 caliber semi-automatic handgun and a loaded magazine recovered, but that a day

-16-

planner with formulas for the manufacture of methamphetamine was also recovered during this traffic stop. See id. at 74-75. Moreover, the officer testified that also on September 1, 1998, Ware reported that he was on his way to meet Schreckhise and Atkins. See id. at 76. The testimony of co-conspirators further indicated that at the time of the stop, Atkins and Schreckhise had been in close association for at least several weeks and that Atkins had visited Schreckhise's Liberty residence, where he was present while methamphetamine was being manufactured. The drug enforcement officer also testified, at Atkins's sentencing hearing, that he was present at the traffic stop of Schreckhise's vehicle on December 29, 1998, during which stop a firearm was recovered. See id. at 80.

We hold that the facts to which the drug enforcement officer testified clearly establish a temporal and spacial relationship between the weapon which was recovered on September 1, 1998, and the drug activity of the conspiracy. We, therefore, further hold that the district court did not clearly err in finding that Schreckhise's possession of a firearm was reasonably foreseeable to Atkins and that it was reasonably foreseeable that the firearm was in furtherance of the conspiracy to manufacture and distribute methamphetamine.

## CONCLUSION

For the reasons stated above we hold that the district court's findings concerning the drug quantity and the possession of firearms were not clearly erroneous. Accordingly, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.