UNITED STATES of America, Appellee,

v.

Edward D. CLAPP, Appellant.

No. 94–1928.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 12, 1994.

Decided Jan. 31, 1995.

Rehearing Denied March 9, 1995.

---

Bruce A. Peterson, Minneapolis, MN, argued, for appellant.

Mark Pitsenbarger, Asst. U.S. Atty., Minneapolis, MN, argued, for appellee.

Before WOLLMAN, Circuit Judge; HEANEY, Senior Circuit Judge; and HANSEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

Edward D. Clapp was convicted by a jury of two counts of bank fraud in violation of 18 U.S.C. § 1344, stemming from a bank loan he took for the purchase and development of

property in Minnesota.[1] Prior to trial, he moved to suppress evidence seized and statements made pursuant to several search warrants based on his allegation that the affidavit in support of the warrants contained material misstatements and omissions. After a hearing, a magistrate judge recommended that his motion be denied. The district court accepted the magistrate judge's recommendation. On appeal, Clapp raises as error the district court's denial of his motion to suppress the evidence seized and the statements made pursuant to the warrants; the court's exclusion of certain expert testimony; and the court's jury instructions on intent to defraud. We affirm on all issues.

## I. BACKGROUND

### A. The Purchase of the Property.

The defendant, along with his brother, Frederick H. Clapp, owned and operated Clapp–Thomssen Company ("Clapp–Thomssen"), a real estate brokerage and development corporation. In 1986, Clapp–Thomssen became the listing agent for a 45–acre tract of property in Brainerd, Minnesota, known as the B.N. Center, which was originally used by the Burlington Northern Railroad Company as a manufacturing and maintenance yard. After an unsuccessful attempt by an Arizona-based corporation to buy the property, the defendant informed Richard Smith, the owner of the site, that he and others were interested in purchasing the property for $1,000,000.[2] Clapp identified the First Federal Bank in Huron, South Dakota ("First Federal") as a possible source of funding for the property. First Federal agreed to finance the purchase of the property, but only after receiving the assurance of Brainerd city officials that the city would issue tax increment financing ("TIF") bonds and use the proceeds to repay First Federal.

Following approval of the loan, First Federal sent Clapp a loan commitment letter stating that the bank agreed to loan Clapp $1,500,000 to purchase and develop the B.N. Center property. The letter included a pro-

vision that all costs in connection with the loan be paid by the borrower. Clapp signed and returned the commitment letter acceding to the terms and conditions set forth therein. The parties later met to discuss the terms of the promissory note, which, in its final version, included the following provision:

Principal amounts under this note shall be advanced from the bank from time to time upon receipt thereby of a written requisition from Clapp–Thomssen Company requesting the amount to be advanced and specifying the purposes for such advance. Such requisition(s) shall be accompanied by an opinion of Bond Counsel to the City of Brainerd attesting that the amount of such advances(s) for such purposes may be reimbursed to Clapp–Thomssen Company from the proceeds of said bonds pursuant to the laws of the State of Minnesota.

Appellant's App. at 262. The provision was an added, but unusual, measure of protection for the bank. In order to obtain money, Clapp had to make a written request specifying the purposes for the money, and provide, in the form of an opinion letter, the assurance of the City of Brainerd that the proposed use of the proceeds was reimbursable from TIF bonds.

In February 1987, Clapp submitted a written request to First Federal requesting an advance of $1,250,000 to be paid through Title Insurance Company of Minnesota ("Title Insurance") to Smith for the purchase of the property. The letter made no mention of fees or commissions. The request was approved by Brainerd's bond counsel, and the relevant parties met to close the deal. The closing statement prepared by Title Insurance showed a selling price of $1,250,000 with net proceeds of $1,240,399 ($1,250,000 minus $9,601 in miscellaneous fees) due Smith. Title Insurance issued Smith a check for $1,240,399, which Smith promptly endorsed. Smith was then asked to sign another document authorizing Title Insurance to issue two checks, one payable to Smith in the amount of $920,399 and the other payable to Clapp–

---

1. Clapp was sentenced to two years probation.

2. Clapp was encouraged to abandon the role of mere broker in the sale of the property, and take

on the role of buyer by Brainerd City Council President, Mildred Michaelis. Clapp planned to develop the railroad yard as an industrial park.

Thomssen in the amount of $320,000. Smith thought the transaction was proper because he had received the amount he expected to receive—$1,000,000 less approximately $70,000 in sales commissions for Clapp–Thomssen. However, the other parties present at the closing, including then president of First Federal, Paul Mavity, were unaware that Clapp had received $320,000.[3]

In March Clapp asked the bank to advance the remaining $250,000 of the loan to pay approximately $100,000 in incurred expenses and $150,000 in anticipated expenses. According to the agreed-upon procedure, Brainerd's bond counsel opined that the anticipated expenses could be repaid by the TIF bond proceeds. Clapp was advanced the $250,000. By October the advance had been disbursed for a number of purposes, including commission fees and "other disbursements," *e.g.,* equipment relocation, title insurance, and survey costs. In September 1988, First Federal foreclosed on the loan after no payments were made on it.

In early 1989, Smith met with officers of the Minnesota Department of Revenue ("MDR") regarding his sale of the B.N. Center property. MDR believed that Smith had received approximately $1,250,000 from the sale of the property and wished to know why he had reported net proceeds of only $930,000. Smith confirmed that the purchase price of the property was $1,000,000; that Clapp–Thomssen was paid $320,000 in commissions and sales fees; and that, consistent with discussions he had had with Clapp about satisfying the mortgage lender and the City of Brainerd, commissions and fees were intentionally excluded from the closing statement, but were paid from the initial disbursement of the loan. In February 1990, Smith was interviewed by an agent of the Minnesota Bureau of Criminal Apprehension ("BCA") regarding the property transaction. Smith told Special Agent Ray DiPrima, who recorded Smith's statements in a written report, that the $320,000 issued to Clapp–Thomssen constituted payment of $70,000 for a commis-

sion and $250,000 for seed money for the development of the project.

### B. *The Search Warrants and Accompanying Affidavit.*

On March 22, 1990, BCA Special Agent Donald Tweedy and other officers executed a search warrant at Clapp–Thomssen's offices. At Clapp's request, the officers first interviewed him. Clapp admitted that he had received the $320,000 and had not disclosed that payment on the closing statement. Agents executed two more search warrants on May 15, 1990, one for Clapp–Thomssen's offices and storage areas and one for Clapp's personal residence. The same affidavit used to support the March warrant application was used to support both of the May warrant applications. Clapp was subsequently interviewed by BCA officers about information and documents obtained during the searches.

After his indictment on March 3, 1993, Clapp moved to suppress evidence seized and statements made pursuant to the search warrants. Pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a hearing was held to determine whether the affidavit, which was penned by Agent Tweedy, contained material false statements and omissions. Applying the *Franks* analysis, a magistrate judge found that portions of Tweedy's affidavit contained falsehoods and omissions that were made with reckless disregard for the truth. Magistrate's July 9, 1993, Rpt. and Rec. at 11. Nonetheless he held that probable cause existed for the searches of Clapp's offices and residence in light of inculpatory information that should have been included in the affidavit in the first instance. The district court accepted the magistrate's conclusion that probable cause existed for the searches, but disagreed with his finding that the challenged statements in Tweedy's affidavit were made with reckless disregard for the truth. Rather, the court held the statements were evidence of negligent conduct on Tweedy's part. *United States v. Clapp,* No. 4–93–44, slip op. at 8 (D.Minn. Sept. 17, 1993).

---

3. The $320,000 amount was disbursed as follows: $135,000 to Clapp–Thomssen for commissions; $135,000 to Lance K. Morque, a Clapp–Thomssen agent, for commissions; and $50,000 to Griffith R. Morris for consulting services. Appellee's Br. at 6.

## II.

### A. *The Franks Challenge.*

We review a district court's ruling on a motion to suppress evidence under the clearly erroneous standard. *United States v. Lueth,* 807 F.2d 719, 725 (8th Cir.1986). Under this standard, a district court's decision will ordinarily be affirmed unless it is unsupported by substantial evidence; based on an erroneous interpretation of applicable law; or, in light of the entire record, the court is left with a firm and definite conviction that a mistake has been made. *United States v. Williams,* 981 F.2d 1003, 1005 (8th Cir.1992).

To succeed in a *Franks*-type challenge to the validity of a search warrant, a defendant must establish by a preponderance of the evidence that the affiant, either knowingly and intentionally, or with reckless disregard for the truth, included a false statement within the warrant affidavit. *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676–77; *Williams,* 981 F.2d at 1005. The same analysis applies to omissions of fact. The defendant must show that the facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading. *United States v. Humphreys,* 982 F.2d 254, 258 n. 2 (8th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 61, 126 L.Ed.2d 31 (1993); *United States v. Reivich,* 793 F.2d 957, 960–61 (8th Cir.1986). The reviewing court must then determine whether, either absent the false material or supplemented with the omitted material, the affidavit's remaining contents are sufficient to establish probable cause. *See Franks,* 438 U.S. at 156, 98 S.Ct. at 2676–77; *United States v. Falls,* 34 F.3d 674, 681 (8th Cir.1994). If the remaining contents are insufficient to establish probable cause, the warrant must be voided and the evidence or statements gathered pursuant to it excluded. *Falls,* 34 F.3d at 681. Mere negligence or innocent mistake is insufficient to void a warrant. *Franks,* 438 U.S. at 171, 98 S.Ct. at 2684; *United States v. Parsons,* 585 F.2d 941, 942 (8th Cir.1978), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979).

Evidence of false statements and omissions presented by Clapp at the *Franks* hearing focused on four portions of Tweedy's affidavit: (1) facts relating to Smith's interview with Agent DiPrima; (2) statements relating to Clapp's request for an advance of funds for the payment of an insurance premium; (3) statements concerning the amount of money requested for environmental assessments; and (4) statements concerning the nature of the deed used in the sale of the B.N. Center property to another buyer, and First Federal's knowledge of and receipt of proceeds from the sale. Appellant's App. at 211–14. The district court limited its examination to statements regarding Smith's interview with DiPrima. After concluding that the statements were neither deliberately false nor made with reckless disregard for the truth, the court considered unchallenged portions of the affidavit and found that they provided sufficient information to establish probable cause. Accordingly, it declined to consider the remaining problem areas in the affidavit. *See United States v. Clapp,* No. 4–93–44, slip. op. at 9 n. 4 (D.Minn. Sept. 17, 1993).

The relevant portions of the affidavit concerning the Smith interview are contained in paragraph five:

> Affiant *participated in an interview* of Richard Smith on 2/22/90, where Smith provided a copy of [a] check drawn on the account of Minnesota Title in the amount of $920,399.05, dated 2/12/87, payable to Smith. *Smith said that this was all he expected to receive as payment for the property and that he didn't know where the remaining $329,600.95 went from the $1,250,000 the Huron Bank had sent to the Title company for disbursement at the closing.* Affiant believes that CLAPP intentially [sic] misled the Huron Bank to believe that the entire $1,250,000 was paid to Smith and conceal the $329,600.95 received by CLAPP.

Appellant's App. at 212 (emphasis added). Clapp argues that Tweedy's statement that he "participated" in an interview with Smith is false, since Tweedy only overheard portions of the interview while tending to other work across the room behind a five-foot partition. He also claims the statement that Smith "didn't know where the remaining

$329,600.95 went" is directly contrary to information in the report DiPrima wrote on his interview with Smith.

■ Tweedy's statement that he participated in the interview with Smith was misleading and inappropriate. Tweedy overheard the interview from his desk fifteen to twenty feet away and was working on unrelated matters at the time. In addition, his statement that Smith did not know where the remaining money went was plainly inaccurate, since Smith told DiPrima that he received a check for the full $1,250,000, which he endorsed, and that separate checks were then issued for $920,399.05 in Smith's name and the balance in Clapp's name. All of this information was included in DiPrima's report on his interview with Smith.

Notwithstanding that Tweedy's statements were inaccurate, we do not believe that they were deliberate falsehoods or made with reckless disregard for the truth.[4] Whether a statement is made with reckless disregard for the truth is a question that, although touched on, was not fully answered by the Supreme Court in *Franks*.[5] The Court's discussion on the subject is limited to one paragraph:

> When the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful* showing. This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Franks*, 438 U.S. at 165, 98 S.Ct. at 2681 (citations omitted) (emphasis in original).

Clapp argues that the district court erred in focusing exclusively on the last sentence in the above text as the proper test for determining whether a statement is true. He argues that were the affiant's *mere belief* that a statement is true sufficient to negate allegations of falsity or recklessness, affiants' statements could virtually never be challenged, as few affiants would ever admit that their statements were in fact not true. In short, he calls upon us to adopt an objective standard for determining whether an affiant has made a statement in reckless disregard of the truth.

As Clapp properly notes, search warrants need not always be literally true in order to be valid given investigative time constraints and officers' reliance on hearsay information. We disagree with Clapp's argument, however, that the Court's language in *Franks* is tantamount to a "less stringent standard of truthfulness," which, although acceptable in reviewing a search warrant as a whole, is an inappropriate way "to define truth in the initial scrutiny of specific statements by [an] affiant." Appellant's Br. at 19. Courts, including our own, that have attempted to define reckless disregard for the truth have looked to what the affiant "believed or appropriately accepted" as true; *see Lueth*, 807 F.2d at 726; *United States v. Luschen*, 614 F.2d 1164, 1172 (8th Cir.1980), *cert. denied*, 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980); a number have explicitly adopted the First Amendment libel standard for determining whether a statement is made with reckless disregard for the truth. *See United States v. A Residence Loc. at 218 3rd St.*, 805 F.2d 256, 258 (7th Cir.1986); *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Pritchard*, 745 F.2d 1112, 1116 (7th Cir.1984); *United States v. Davis*, 617 F.2d 677, 694 (D.C.Cir.1979); *United States v. Dorfman*, 542 F.Supp. 345, 369 (N.D.Ill.1982), *aff'd sub nom. United States v. Williams*, 737 F.2d

---

**4.** There is no evidence in the record, and Clapp offers none, that the statements were deliberately false.

**5.** *See United States v. Davis*, 617 F.2d 677, 694 (D.C.Cir.1979) ("Unfortunately, the Supreme Court in *Franks* gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that 'negligence or innocent mistake [is] insufficient.'"), *cert. denied*, 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980).

594 (7th Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Applying the First Amendment standard to Fourth Amendment cases, these courts have looked to whether the affiant "in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein."[6] *Dorfman,* 542 F.Supp. at 369. Under this definition, neither Tweedy's statement about having participated in Smith's interview nor his failure to precisely report the details of Smith's interview with DiPrima constitutes reckless disregard for the truth; both, rather, evince negligent conduct. Tweedy's statement that he participated in the Smith interview was misleading and, thus, was negligent; it was not reckless, however. Similarly, his statement that Smith did not know where the remaining money went was more the product of carelessness than recklessness. Had Tweedy admitted to having read DiPrima's report yet nevertheless included in the affidavit that Smith did not know where the remaining money went, there might well be grounds for concluding that Tweedy acted in reckless disregard for the truth. Tweedy, however, testified only that he thought the statement was made sometime during DiPrima's interview with Smith.[7] *Franks* Hrg. Tr. at 23.

■■■ Even assuming that Tweedy's statements regarding the Smith interview were made with reckless disregard for the truth and those statements are deleted, the remaining facts support the reasonable probability that evidence of criminal activity would be found in the areas that were searched. The adjusted affidavit provides a substantial basis from which the issuing court could have determined probable cause. " 'Probable cause' to issue a search warrant exists when an affidavit sets forth sufficient facts to justify a prudent person in the belief that contraband will be found in a particular place." *Reivich,* 793 F.2d at 959 (citing *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). Whether probable cause has been established involves a practical, common sense evaluation of the totality of the circumstances. *Id.* (citing *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332).

Deleting both of the statements that Clapp challenges in paragraph five, and not considering DiPrima's interview report, the excised affidavit provides as follows:

1. On 3/21/90, affiant interviewed Ronald Bergmann and Patricia Whiteside, representatives of the Federal Office of Thrift Supervision, Department of Treasury, and learned that their office is responsible for monitoring Federally Chartered Savings and Loans, including the Huron Bank.

2. Bergmann said that his agency had been examining a mortgage loan which had been made to CTBN Limited Partnership in the amount of $1,500,-000.

3. Bergmann provided affiant with a copy of a letter dated 2/11/87, from CLAPP, signed by CLAPP as representing "CTBN Limited Partnership, by: Clapp Thomssen Company, Its General Partner," in which CLAPP requests an advance of $1,250,000 from $1,500,000 mortgage proceeds to be paid to Richard Smith for the purchase of the (Burlington Northern) property.

4. Affiant obtained a copy of a closing statement, signed by Sandy Sichack, as representing Minnesota Title, which indicated that $1,250,000 was paid to Richard R. Smith on 2/12/87, for the purchase of the subject property.

■■■ Smith provided a copy of [a] check drawn on the account of Minnesota

---

6. The test for determining whether an affiant's statements were made with reckless disregard for the truth is thus not simply whether the affiant acknowledged that what he reported was true, but whether, viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.

7. We note that Tweedy's affidavit was far from a model one. Indeed, it is one that law enforcement officers would do well to study as an example of the potential hazards that accompany an inattention to detail.

Title in the amount of $920,399.05, dated 2/12/87, payable to Smith. Appellant's App. at 212. The affidavit states that Clapp requested $1,250,000 from the bank to pay Smith for the B.N. Center property, that the closing statement indicated Smith was paid $1,250,000 for the property, but that Smith's net proceeds on the property were only $920,399.05. Given that the difference between the sales price and the seller's net proceeds was not accounted for, and that it was unclear who received this amount, a reasonable person could believe that one or more of the participants in the property transaction may have been involved in bank fraud and that evidence of fraudulent activity would be found at Clapp's office.

Clapp argues that the mere information that a seller "did not walk away with the full sales price does not support the probability of a crime." Appellant's Br. at 28. In support of this he notes that it is not unusual for a seller to receive less than the full amount of a buyer's bank mortgage. Viewing the totality of the circumstances, we believe that a reasonable person could find that Clapp's actions were more consistent with criminality than they were with innocent behavior. The mere possibility that Clapp may have used the difference between the sales price and the seller's net proceeds to pay a mortgage or pay fees and commissions is not sufficient to prevent a finding of probable cause for "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Gates,* 462 U.S. at 235, 103 S.Ct. at 2331. Accordingly, we find that the district court did not err in denying Clapp's motion to suppress evidence seized and statements made pursuant to the search warrants based on Tweedy's affidavit.

### B. *The District Court's Refusal To Admit Expert Testimony.*

■ Clapp next assigns error to the district court's refusal to admit the expert testimony of Max Hintz, a former bank vice president with expertise in real estate lending. Hintz was prepared to testify that First Federal deviated from sound underwriting and due diligence procedures in making the loan for the purchase and development of the

B.N. Center property, and lacked economic justification for making the loan. Specifically, Clapp argues that Hintz's testimony was relevant to show Clapp's lack of intent to defraud the bank and to illuminate the lack of credibility of First Federal's president, Paul Mavity. We are unpersuaded that the district court abused its discretion in refusing to admit Hintz's testimony. *See United States v. Felak,* 831 F.2d 794, 797 (8th Cir. 1987).

Clapp claims that Hintz's testimony would have confirmed that Mavity's casual behavior conveyed the impression that Clapp's actions were acceptable to First Bank, thus allowing the jury to find that he acted without intent to defraud. Clapp's counsel had ample opportunity to, and did in fact, cross-examine Mavity about the unusual nature of the loan. Whether Mavity's nonchalant behavior influenced Clapp's actions with respect to the loan is an issue that the jury could have considered on its own. Expert testimony is appropriate when it relates to "issues that are beyond the ken of people of ordinary experience." *United States v. French,* 12 F.3d 114, 116 (8th Cir.1993); *see* Fed.R.Evid. 702. " 'Where the subject matter is within the knowledge or experience of laymen, expert testimony is superfluous.' " *French,* 12 F.3d at 116 (quoting *Bartak v. Bell–Galyardt & Wells, Inc.,* 629 F.2d 523, 530 (8th Cir. 1980)). We similarly find that Hintz's testimony was not necessary to illuminate biases that Mavity may have had. Clapp does not claim, nor is there any evidence, that Clapp was prohibited from fully cross-examining Mavity as to reasons he may have had for being biased or not testifying truthfully. The district court did not err in refusing to allow Hintz's testimony.

### C. *The District Court's Jury Instruction on Intent.*

Clapp lastly argues that the district court erred by giving an instruction on intent to defraud which allowed the jury to equate intent to defraud with mere intent to deceive. The court instructed the jury as follows:

To act with an intent to defraud means to act knowingly and with [the] intention or the purpose to deceive *or* to cheat[;] an

intent to defraud is accompanied ordinarily by a desire or a purpose to bring about some gain or benefit to oneself or some other person *or* by a desire or a purpose to cause some loss to some person.

VIII Tr. at 242 (emphasis added). Clapp argues that the use of the disjunctive word "or" in both sentences permitted the jury to find him guilty of having a purpose to deceive without regard to whether he had a purpose to cause harm or loss to another. This instruction, he argues, "allowed mere deception, without any intent to deprive a third party of its property, to satisfy the intent element under the bank fraud statute." Appellant's Br. at 43.

A district court has wide discretion in formulating jury instructions. *United States v. Sleet*, 893 F.2d 947, 949 (8th Cir. 1990); *United States v. Hiland*, 909 F.2d 1114, 1128 (8th Cir.1990). That discretion is not abused when the instructions as a whole accurately and adequately state the applicable law. *Sleet*, 893 F.2d at 949; *United States v. Brake*, 596 F.2d 337, 339 (8th Cir. 1979). Viewing the instructions as a whole, we do not believe the district court's instruction on intent to defraud allowed the jury to convict Clapp for mere deception without regard to whether he intended to deprive a third party of its property. The court instructed the jury that the government had to prove not only that Clapp acted with an intent to defraud, but that he "knowingly executed a scheme or plan to obtain money, funds or other property owned by or under the control of a financial institution by means of false or fraudulent pretenses, representations or promises." VIII Tr. at 239; *see* 18 U.S.C. § 1344. The court defined a "scheme or artifice for obtaining money" as "any deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value." VIII Tr. at 240. Taken together, the court's instructions on intent to defraud and the specific elements of the charged offense adequately informed the jury that it had to find

that Clapp intended to do more than merely deceive. The district court did not err in refusing to give Clapp's proffered instruction.

For the foregoing reasons, the judgment of the district court is affirmed.