# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

Nos. 06-1055/1227

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee/Cross-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Kevin Lee Davis, | * | |
| | * | |
| Appellant/Cross-Appellee. | * | |

———————

Submitted: September 25, 2006
Filed: December 28, 2006

———————

Before WOLLMAN, BRIGHT, and BOWMAN, Circuit Judges.

———————

BOWMAN, Circuit Judge.

Kevin Lee Davis was convicted of conspiracy to manufacture and distribute methamphetamine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), 846; conspiracy to manufacture and distribute marijuana, 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii), 846; and manufacturing marijuana, 21 U.S.C. § 841(a)(1), (b)(1)(D). Davis appeals, challenging the denial by the District Court[1] of his motion to suppress, the sufficiency of the evidence, and the reasonableness of his sentence. The government cross-

———————

[1]The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

appeals, challenging the District Court's drug-quantity calculation at sentencing. We affirm the District Court in all respects.

I.

On February 24, 2005, an arrest warrant was issued for Kevin Davis on account of methamphetamine and marijuana charges. A federal Drug Enforcement Agency (DEA) tactical team working in conjunction with Iowa law enforcement officers (collectively, "the officers") executed the arrest warrant at Davis's Iowa farmhouse the morning of March 15, 2005. For approximately two hours prior to execution, officers conducted surveillance of Davis's house and barn from a vantage point approximately one-quarter of a mile from the house. The officers observed Davis make two trips between his house and barn (which was located approximately 100 yards from the house) on an all-terrain vehicle; one trip lasted approximately thirty to forty minutes, and the other trip lasted only a few minutes. The officers also noted that three to four vehicles and a small trailer were on the property. The officers had prior intelligence suggesting that other persons could be inside the house and/or barn. The officers also had information that Davis kept firearms in the house.

In executing the warrant, a team of five officers knocked and announced their presence at Davis's front door three times, but received no response. While waiting for a response, one team member shouted the word "compromise," which was the team's code word to indicate that a person had been seen or heard inside the house. At this point, the team broke into the house and conducted a sweep of the house. At the same time the team was entering the house, Davis was exiting the house through the kitchen door—apparently not in an attempt to escape, but rather to cooperate. Davis was immediately spotted and arrested by other officers stationed outside of the house. The team that entered and swept the house was not aware that Davis had exited the house, been spotted by other officers, or been arrested.

-2-

During the team's sweep of the house, officers observed several drug-related items in plain view, including: grow lights; water hoses; boxes of plant food and fertilizer; planting pots and blocks; drying shelves; marijuana clippings; and a homemade rifle. During the sweep, Iowa State Patrolman Chad Peters broke into a closet that was padlocked from the outside and discovered rifles and handguns. Davis alleged that another officer opened a toolbox and observed a scale during the sweep, but the government contended that the toolbox remained unopened until execution of the subsequently issued search warrant.

At the same time the team was entering the house, three officers, including Agent Tony Peterson of the Iowa Division of Narcotics Enforcement, conducted a sweep of the barn. These officers swept the barn for approximately thirty seconds and then went to the house. By that point, Davis had been arrested and the house sweep had been completed. During the barn sweep, the officers observed an item they believed was an HCl generator, but was identified as a weed sprayer after the subsequent search.

After the arrest and sweeps, the officers obtained a search warrant for Davis's property. The affidavit in support of the search warrant contained details of the sweeps, including statements that the firearms in the closet were "observed in plain view" and that officers observed an HCl generator in the barn. Suppression Hr'g Ex. A. The affidavit also contained prior intelligence information indicating Davis's involvement with the growth and sale of marijuana. The affidavit was signed by DEA Special Agent Tyson Hodges, who was not present during the arrest. Agent Peterson had dictated the sweep information to Agent Hodges over the phone;[2] and Agent

_____

[2]The affidavit stated that Agent Hodges learned the information about the sweep from DEA Special Agent Frank Feden; however, the testimony during the suppression hearing indicated that the sweep observations were relayed by Agent Peterson. See United States v. Hollis, 245 F.3d 671, 673 (8th Cir. 2001) (noting that Franks v. Delaware, 438 U.S. 154 (1978), hearing permits the defendant to challenge statements

-3-

Peterson had, in turn, received the information that the firearms were observed in plain view from Patrolman Peters.

At trial, the government presented several witnesses who testified about their roles in the operation to manufacture and distribute large quantities of methamphetamine between 2002 and 2004. According to the witnesses, this operation involved the mass purchase of pseudoephedrine pills that were given to various individuals, including Davis, who in turn manufactured methamphetamine for resale by a seller. Under this arrangement, Davis, with the assistance of another individual, manufactured methamphetamine on at least three separate occasions, each time producing quantities that required the consumption of 10,000 pseudoephedrine pills. After each manufacture, Davis provided the seller with two ounces of methamphetamine while retaining the remaining amounts (Davis also sold methamphetamine directly to several individuals). Davis told one individual that he manufactured four-and-one-half to five ounces of methamphetamine per 5,000 pseudoephedrine pills.

Davis also assisted other individuals in the manufacture of methamphetamine for the seller, either directly or by providing his barn for use as a lab. These manufacturers would pay Davis with methamphetamine or anhydrous in exchange for use of the barn. Additionally, Davis directly purchased between 40,000 and 54,000 pseudoephedrine pills for the manufacture of methamphetamine, which he paid for with either money or methamphetamine. One manufacturer saw Davis in possession of approximately one-quarter pound of methamphetamine on one occasion.

The same witnesses also testified about their roles in the manufacture and distribution of marijuana between 2000 and 2003. According to the testimony, Davis harvested large quantities of marijuana and employed two individuals to trim the

contained in a search warrant affidavit in certain circumstances).

-4-

marijuana. In return for these services, Davis provided these two individuals with marijuana. Davis harvested between eighty and one hundred pounds of marijuana during the fall of 2001. Additionally, Davis grew approximately 800 marijuana clone plants per year between 2000 and 2003 and sold them to three sellers in exchange for harvesting services. Finally, Davis sold marijuana to several individuals out of his home.

DEA agents testified that Davis's barn was the type of vented space commonly used to manufacture methamphetamine and that the items found in Davis's house could be used to manufacture marijuana. The government introduced phone records showing calls between the co-conspirator witnesses and Davis. Davis's friends testified that they used methamphetamine and marijuana at Davis's house. A neighbor testified about the high volume of traffic at Davis's house for short periods during the day and night. The jury returned a guilty verdict on all counts.

At sentencing, the District Court applied the sentencing guidelines and calculated a total-offense level of 30 and a criminal history category of I, which resulted in an advisory sentencing range of 97 to 121 months of imprisonment. The District Court applied a two-level dangerous-weapons enhancement and found that Davis was responsible for 4.9 grams of methamphetamine. After considering the 18 U.S.C. § 3553(a) factors, the District Court sentenced Davis to concurrent terms of imprisonment of ninety-seven months for the conspiracy counts and sixty months for the manufacturing count.

II.

Davis first argues that the District Court erred by failing to suppress evidence seized under the search warrant, which was issued based on information obtained from

the protective sweeps of his house and barn.[3] Davis conceded the validity of the house sweep during oral argument, but still contests the validity of the barn sweep. Davis also contends that the officers' inspections of the locked closet and toolbox each exceeded the permissible scope of the house sweep.[4] We review the District Court's factual findings for clear error and its legal conclusions de novo when examining the motion to suppress. United States v. Clayton, 210 F.3d 841, 845 (8th Cir. 2000).

A.

Davis first argues that the protective sweep of his barn was invalid under the standard announced in Maryland v. Buie, 494 U.S. 325 (1990). In Buie, the Supreme Court held that incident to an arrest, officers may, as a precaution and without any requisite level of suspicion, "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" without first securing a search warrant. Id. at 334. The Court also held that officers may sweep additional areas *if* "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene" exist. Id. A "protective sweep" must be "a quick and limited search of premises . . . conducted to protect the safety of police officers or others." Id. at 327. It may only

---

[3]The government conceded that without the information obtained during the sweeps and described in the affidavit, the search warrant would fail for lack of probable cause. Suppression Hr'g Tr. at 198; see Michigan v. Clifford, 464 U.S. 287, 294 (1984) (stating that "a criminal search warrant may be obtained only on a showing of probable cause to believe that relevant evidence will be found in the place to be searched").

[4]During oral argument, Davis also contended that the officers exceeded the scope of a permissible sweep by searching a particular area of his cellar. This point was not argued in the briefs and therefore is waived. See Chay-Velasquez v. Ashcroft, 367 F.3d 751, 756 (8th Cir. 2004).

extend to a cursory inspection of those spaces where a person may be found and may last no longer than is necessary to dispel the reasonable suspicion of danger, and in any event, may last no longer than it takes to complete the arrest and depart the premises. Id. at 335–36. A protective sweep is justified by the threat of accomplices launching a surprise attack during an arrest and is particularly important during an in-home arrest, due to the heightened potential for an ambush in unfamiliar surroundings. Id. at 333. A protective sweep may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers. United States v. Jones, 193 F.3d 948, 950 (8th Cir. 1999).

Because the barn did not immediately adjoin the place of arrest, the question is whether the officers conducting the sweep possessed a reasonable belief, based on specific and articulable facts, that the barn harbored an individual who posed a danger to the officers. Buie, 494 U.S. at 334. The District Court held that the officers were permitted to conduct the protective sweep of the barn under this standard and that the officers also had the authority to sweep the barn in connection with their execution of the arrest warrant. Because we hold that the officers' actions were justified under Buie, we do not address the District Court's alternative rationale.

The protective sweep of the barn was justified by several articulable facts and resulting rational inferences that created a reasonable suspicion that accomplices could pose a threat to the safety of the arresting officers. These facts and inferences include: (1) the surveillance officers observed Davis going to and from his barn twice in two hours, from which they could infer that he had contact with an accomplice (or accomplices); (2) three to four vehicles and a trailer were parked on the property, which could indicate the presence of accomplices; (3) the officers had prior intelligence of individuals coming to the property to manufacture methamphetamine; (4) prior intelligence indicated that Davis possessed firearms, which could indicate a danger to officer safety; (5) the officers had been informed that Davis associated with dangerous and violent persons, which also could indicate a potential danger to officer

safety; and (6) surveillance cameras were attached to the house, which could indicate the heightened possibility of a surprise attack. These facts and inferences, especially when considered in the aggregate, would have led a reasonable officer to conclude that individuals posing a legitimate threat to his safety could be lurking in Davis's barn. While it is true that the barn did not immediately adjoin the area of arrest, the barn was not so far removed from the house that a reasonably prudent officer could dismiss the potential danger. Considering that Davis had made two trips to the barn in two hours and that multiple vehicles were present on the property, the officers could reasonably conclude that accomplices were inside the barn. Combined with the information that Davis possessed firearms, that he associated with violent persons, and that surveillance cameras were mounted outside of the house, it was reasonable for the officers to conclude that their safety was threatened and that a protective sweep of the barn was permissible.

Moreover, even if we were to assume that it was improper for the officers to conduct a protective sweep of the barn, the evidence observed in plain view during the house sweep (which Davis concedes was valid under <u>Buie</u>) satisfied the probable cause requirement for issuance of a search warrant. For these reasons, Davis's argument regarding the protective sweep of his barn fails.

### B.

Davis next argues that although the protective sweep of his house was valid under <u>Buie</u>, the officers exceeded the permissible scope of the house sweep by opening a locked closet door and allegedly opening a toolbox. Because the search warrant was partially issued based on the house sweep's observations, Davis contends the search warrant was invalid.

A protective sweep must be quick and limited to places where persons could be hiding.  Buie, 494 U.S. at 327.  The search should take no longer than necessary to complete the arrest and leave the premises.  Id. at 335–36.

The District Court concluded that breaking into the locked closet exceeded the scope of a lawful protective sweep, and we agree.  The officer who broke the lock acknowledged that nothing he observed indicated that anyone was hiding in the closet and that if someone were actually hiding inside, the individual would have been locked in the closet.  However, the District Court also ruled that the "abundant" evidence found within the permissible scope of the protective sweeps still established probable cause to support the search warrant, and we agree. Ruling at 5.

Regarding the toolbox, there was conflicting testimony as to whether the officers opened a toolbox containing a scale during the house sweep or whether they waited until after obtaining a search warrant.  Opening a small toolbox would exceed the scope of a lawful protective sweep; however, the District Court was not persuaded that the officers did in fact prematurely open this toolbox, and we cannot say that this finding was clearly erroneous.  For these reasons, Davis's argument that the officers exceed the lawful scope of the house sweep fails.[5]

---

[5]Our opinion analyzes the validity and proper scope of the sweeps *in this case*. However, brief mention of an issue identified during the suppression hearing is warranted.  Four officers testified that it is their department's policy to conduct a sweep of a house during *every* home arrest as a matter of course.  While we recognize the reality that these particular officers are often executing drug-related warrants, which frequently involve a threat to officer safety and thereby justify protective sweeps, Buie clearly instructs that protective sweeps must be justified on an individualized basis.  Buie does not allow for a sweep in all cases.  494 U.S. at 334 n.2.  Here, the circumstances justified the protective sweep, and future sweeps must be similarly justified in the individual cases, and may not be conducted as a matter of course.

C.

Davis's final argument regarding his suppression motion is that the information contained in the search warrant affidavit violated the standard articulated in Franks v. Delaware, 438 U.S. 154 (1978), and therefore the warrant was invalid. Davis further contends that the good-faith exception described in United States v. Leon, 468 U.S. 897 (1984), should not apply.

To prevail on a Franks claim, a defendant must show that: (1) the affiant knowingly and intentionally, or with reckless disregard for the truth, included false information in or excluded material information from the search warrant affidavit; and (2) the affidavit, excluding the false inclusion or including the missing material information, would not support a finding of probable cause. 438 U.S. at 155–56; United States v. Clapp, 46 F.3d 795, 799 (8th Cir. 1995). Neither mere negligence nor an innocent mistake will, by themselves, void a warrant. Franks, 438 U.S. at 171; Clapp, 46 F.3d at 799. Probable cause to issue a search warrant exists when an affidavit in support of the warrant sets forth sufficient facts to establish that there is a "fair probability that contraband or evidence of" criminal activity will be found in the particular place to be searched. Illinois v. Gates, 462 U.S. 213, 238 (1983); see Clapp, 46 F.3d at 801. Probable cause determinations are made in light of the totality of the circumstances. Clapp, 46 F.3d at 801.

The threshold issue is whether the statements in the affidavit that the firearms in the closet were in "plain view" and that an HCl generator was observed in the barn were made with knowing and intentional or reckless disregard for the truth. We agree with the District Court that the statement about the HCl generator, which was actually a weed sprayer, was an "honest mistake," and therefore does not violate the first prong of Franks. Ruling at 4. We also agree with the District Court that the statement that the firearms were observed in "plain view" was made in reckless disregard of the truth. Ruling at 5. The officer who broke the lock and observed the firearms inside

the closet acted outside the scope of a lawful protective sweep. The firearms, therefore, were not in plain view. See Harris v. United States, 390 U.S. 234, 236 (1968) (per curiam) (noting that an item is in plain view if it is observed by an officer standing in a place where he is legally entitled to be). While some governmental actions raise substantially difficult questions about the constitutional limitations on governmental conduct, the opening of a closet padlocked from the outside during a sweep to look for potential accomplices is not reasonably debatable. Therefore, the statement that the firearms were in "plain view" was made in reckless disregard of the truth.[6]

Under the second Franks prong, however, Davis's argument fails because even after excluding the statements about the firearms and HCl generator, the affidavit provided probable cause to support the search warrant. Because Davis's Franks claim fails, we need not reach the Leon good-faith argument.

## III.

Davis next argues that there was insufficient evidence to support his convictions. We review the evidence, including all reasonable inferences drawn therefrom, in the light most favorable to the government and will only reverse if no

---

[6]The fact that the affiant, Agent Hodges, was not aware that the firearms were not in plain view does not change the result under Franks, nor does the fact that Agent Hodges's source of information, Agent Peterson, was also unaware of the truth. Patrolman Peters's statement cannot be insulated from a Franks challenge simply because it was relayed through two officers who were both unaware of the truth. See Franks, 438 U.S. at 163 n.6 (noting with approval the premise that "police [may] not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity"); accord United States v. Kennedy, 131 F.3d 1371, 1376 (10th Cir. 1997) (collecting cases), cert. denied, 525 U.S. 863 (1998).

reasonable jury could have found Davis guilty beyond a reasonable doubt. United States v. Espino, 317 F.3d 788, 792 (8th Cir. 2003).

A.

To prove a conspiracy to manufacture or distribute a controlled substance, the government must prove that (1) there was an agreement or understanding to manufacture or distribute a controlled substance, (2) the defendant knew of the agreement or understanding, and (3) the defendant intentionally joined the agreement or understanding. Id. at 792. A conspiracy may be proved by direct or circumstantial evidence. Id. With respect to Davis's methamphetamine conviction, the government must prove that Davis intended to manufacture or distribute at least fifty grams of methamphetamine. See 21 U.S.C. §§ 841(b)(1)(A)(viii), 846.

There was sufficient evidence to support Davis's conviction for conspiracy to manufacture or distribute methamphetamine. The government presented evidence that Davis: (1) manufactured methamphetamine for a seller on at least three separate occasions; (2) directly assisted other individuals in the manufacture of methamphetamine; (3) provided his barn to other individuals for the manufacture of methamphetamine; (4) received methamphetamine and pseudoephedrine pills for his efforts; and (5) sold methamphetamine himself. The cooperation between Davis and the primary seller (i.e., the exchanges of pills and finished methamphetamine), and between Davis and the other manufacturers (i.e., the use of his barn for the manufacture of methamphetamine) shows both that there was an agreement or understanding between Davis and these co-conspirators and that Davis knew of the agreement or understanding. Davis intentionally joined the agreement, as shown by his voluntary acts, including accepting pills, providing finished methamphetamine, allowing the use of his barn for manufacturing, and selling methamphetamine. The government satisfied the statutory drug-amount requirement, presenting evidence that Davis manufactured two ounces of methamphetamine on three separate occasions, and

that Davis manufactured approximately five ounces of methamphetamine per 5,000 pseudoephedrine pills.

Davis essentially attacks this verdict on two grounds, arguing that the testimony of the government's key witnesses was speculative and biased, and that the testimony of a DEA agent was based on assumptions. Davis contends that the government's co-conspirator witnesses were not credible because they testified after reaching plea agreements and they did not possess personal knowledge that Davis actually manufactured methamphetamine. He argues that the DEA agent's testimony regarding the likelihood that Davis's barn was a methamphetamine lab was speculative because the presence of a ventilation system could be explained by Davis's ownership of a body shop. Finally, Davis contends that the agent's testimony that Davis distributed methamphetamine was unsubstantiated because no methamphetamine was found on Davis at the time of his arrest.

Questions of credibility are the province of the jury and are "virtually unreviewable on appeal." United States v. Candie, 974 F.2d 61, 64 (8th Cir. 1992). The jury may consider whether a witness has a plea agreement as part of its credibility determination. Espino, 317 F.3d at 794. Evidence of these witnesses' plea agreements was offered, and the jury was free to accept or reject their testimony. Similarly, the jury was free to accept or reject the testimony of the DEA agent after considering the agent's training and experience and evaluating his opinion. The co-conspirators' personal knowledge of Davis's actions was evident from their testimony. The government was not required to show that Davis possessed methamphetamine at the time of his arrest to support the conviction. It is apparent that the jury accepted the testimony Davis now challenges. We will not disturb the verdict because the jury exercised its prerogative to credit this testimony.

B.

With respect to the marijuana convictions, the government was required to prove not only that Davis conspired to manufacture or distribute marijuana, see 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846, but also that Davis knowingly or intentionally manufactured marijuana, see 21 U.S.C. § 841(a), (b)(1)(B).

There was sufficient evidence to support Davis's marijuana convictions. The government presented evidence that Davis: (1) harvested marijuana; (2) employed individuals to harvest and trim marijuana; (3) provided marijuana plants to co-conspirators; and (4) sold marijuana. Davis's cooperation with others, his harvesting of marijuana, and his sale of marijuana shows that there was an agreement or understanding to manufacture and distribute marijuana and that Davis knew of the agreement or understanding. Davis's voluntary actions, including providing marijuana plants to others and selling marijuana, show that he intentionally joined the agreement or understanding. Davis's harvesting of marijuana and employment of others show that Davis knowingly and intentionally manufactured marijuana.

Davis again argues that the government's co-conspirator witnesses were unreliable due to their plea agreements, and that the DEA agent's testimony regarding Davis's manufacture of marijuana was speculative. Just as with the methamphetamine count, the jury was free to make credibility determinations and to accept or reject the testimony, and we again do not see any proper reason to disturb the jury verdict.

IV.

Davis next argues that the ninety-seven month sentence imposed by the District Court is unreasonable. We review sentences for unreasonableness. United States v. Adams, 401 F.3d 886, 895 (8th Cir.), cert. denied, 126 S. Ct. 492 (2005). We review the District Court's application of the sentencing guidelines de novo and its factual

-14-

findings for clear error.  <u>United States v. Johnston</u>, 353 F.3d 617, 625 (8th Cir. 2003), <u>cert. denied</u>, 541 U.S. 1068 (2004).

A.

Davis first contends that the District Court erred in applying a two-level enhancement for possession of a firearm.  The guidelines provide for a two-level enhancement when the government shows by a preponderance of the evidence, <u>see</u> <u>United States v. Atkins</u>, 250 F.3d 1203, 1214 (8th Cir. 2001), that a firearm was present and it is not clearly improbable that the firearm was connected to a drug crime. U.S. Sentencing Guidelines Manual § 2D1.1(b)(1), cmt. n.3.  A connection between a firearm and drug-related activities may be shown by proof that the firearm was located in the same place as the drugs or drug-related activity.  <u>Atkins</u>, 250 F.3d at 1214.  Proof that a firearm was located in the same room as drug-related items supports the conclusion that the defendant's drug activities were conducted in that room and that the gun was used in connection with the activities.  <u>United States v.</u> <u>Moore</u>, 212 F.3d 441, 447 (8th Cir. 2000).

The District Court did not err in applying the enhancement for possession of a firearm.  Several firearms, including a shotgun, rifles, and handguns were found in the same room as marijuana and marijuana-manufacturing items such as seeds and scales. Witnesses testified that drug transactions were conducted in the same room as the firearms. This close proximity of the firearms to the drug activity—in addition to the number and type of weapons involved (i.e., handguns)—support the conclusion that the firearms were used in connection with drug activity.  Therefore, the District Court's finding that it was not clearly improbable that the firearms were connected to drug-related activity was not clearly erroneous.

B.

Davis further contends that the District Court failed to fully consider mitigating factors raised during the sentencing hearing—specifically that he had suffered from an addiction to methamphetamine, was participating in rehabilitation, intended to remain sober, and desired to provide a positive role-model for his children. The District Court did consider each of these mitigating factors; Davis's addiction, rehabilitation, sobriety, and family were each discussed in detail during the sentencing hearing. The District Court also considered the need for deterrence and treatment, as well as the circumstances of Davis's crime, before ultimately imposing a sentence at the low end of the guidelines. We are satisfied that the District Court did not err in this regard.

V.

Finally, the government argues that the District Court erred in determining the amount of methamphetamine attributable to Davis. Specifically, the government contends that the District Court failed to make adequate factual findings in support of the methamphetamine quantity attributable to Davis. We review the District Court's ultimate factual findings of drug quantity for clear error. United States v. Granados, 117 F.3d 1089, 1093 (8th Cir. 1997).

"The base offense level for drug offenses is determined by the quantity of illegal drugs attributable to the defendant." United States v. Candie, 974 F.2d 61, 64 (8th Cir. 1992). "Quantity is an issue for the sentencing judge." Id. If the defendant challenges the drug quantity calculated in the presentence investigation report (PSR), the District Court must make a factual determination of the quantity of drugs attributable to the defendant. Fed. R. Cr. P. 32(i)(3)(B) ("[F]or any disputed portion of the [PSR] or other controverted matter" during sentencing, the District Court must "rule on the dispute or determine that a ruling is unnecessary either because the matter

will not affect sentencing, or because the court will not consider the matter in sentencing."); <u>Atkins</u>, 250 F.3d at 1212; <u>Candie</u>, 974 F.2d at 64.  The District Court satisfies Rule 32(i)(3)(B) if it "makes a clear statement indicating 'it was relying on its impression of the testimony of the witnesses at trial, coupled with its specific rejection of the defendant's quantity objections.'" <u>United States v. Villareal-Amarillas</u>, 454 F.3d 925, 930 (8th Cir. 2006) (quoting <u>United States v. Flores</u>, 73 F.3d 826, 835 (8th Cir.), <u>cert. denied</u>, 518 U.S. 1027 (1996), <u>petition for cert. filed</u>, (U.S. Nov. 13, 2006) (No. 06-7772)).  While the majority of appeals have involved a district court's rejection of a defendant's drug-quantity objections, the same specificity requirements apply to district courts when the government's drug-quantity calculations are rejected. <u>See</u>, <u>e.g.</u>, <u>United States v. Randolph</u>, 101 F.3d 607, 608–09 (8th Cir. 1996).

In this case, Davis disputed the PSR's drug quantity at sentencing, thereby obligating the District Court to make specific factual findings supporting its ruling, unless the drug quantity would not have affected sentencing or would not have been considered.  Drug quantity did affect Davis's sentencing, as the government's proposed finding would have resulted in a base-offense level of at least 36.  After hearing arguments from both Davis and the government advocating different drug-quantity determinations, discussing credibility issues of both the government and the defense witnesses, and considering the relevant jury instruction not to consider sentencing issues in its drug-quantity determination, the District Court found that 4.9 grams of methamphetamine were attributable to Davis.  The District Court stated, "That's what I find, 4.9.  I was comfortable with the jury determination on [drug-quantity] when it came in, and I'm still comfortable with that, whether it's beyond a reasonable doubt standard or a preponderance standard."  Sent. Tr. at 28–29.

The District Court's findings satisfied Rule 32(i)(3)(B).  While the government contends that the District Court's statement was too conclusory to allow for "meaningful appellate review," <u>see</u> <u>Candie</u>, 974 F.2d at 65, this narrow reading views the statement in isolation and ignores the surrounding context of the District Court's

ruling. The District Court satisfied the first Flores clear-statement requirement during the exchange with government counsel when the District Court expressed its reservations about the credibility of both the government and the defense witnesses. The government argued for a higher drug-quantity determination based on the testimony of Davis's co-conspirators, but the District Court declined the invitation to rely on that testimony and asked, "All of the witnesses [the government is] relying on [to prove drug quantity] really carried a lot of credibility baggage, did they not?" Sent. Tr. at 26. The District Court followed this statement by noting that the defense witnesses also possessed credibility shortcomings: "We had a lot of tales told in this trial by people who had a lot of motive; is that a fair statement?" Id. These statements came during arguments by both sides that fully addressed the applicable trial testimony and were made by the trial judge who observed firsthand each witness's testimony. These credibility determinations are entitled to great deference on appeal. See, e.g., United States v. Funk, 985 F.2d 391, 394 (8th Cir.), cert. denied, 508 U.S. 967 (1993). The District Court satisfied the second Flores clear-statement requirement by specifically rejecting the government's drug-quantity calculations, which were fully advanced by counsel but ultimately rejected in favor of a lower determination consistent with the jury verdict.

This result is consistent with several cases that have held that a district court's quantity findings were sufficient under Rule 32(i)(3)(B) and its precursors. See, e.g., United States v. Jimenez-Villasenor, 270 F.3d 554, 563 (8th Cir. 2001) (holding that the district court's findings were sufficient where the court noted that the parties offered competing drug-quantity calculations, heard the parties' respective arguments, and ultimately based its finding on trial testimony and other evidence); United States v. Brown, 91 F.3d 1109, 1112 (8th Cir. 1996) (holding that the district court's findings were sufficient where the district court merely stated that it credited the trial testimony with respect to the drug quantity); United States v. Scott, 91 F.3d 1058, 1062–63 (8th Cir. 1996) (holding that the district court's findings were sufficient where the district court expressly rejected the defendant's drug-quantity calculations and stated its

reliance on trial testimony); <u>United States v. Edwards</u>, 994 F.2d 417, 423 (8th Cir. 1993) (holding that the district court's drug-quantity findings were sufficient where "the district court's comments at the sentencings, and its specific overruling of appellants' quantity objections to the PSRs, make it clear that the court credited [the government witness's] quantity testimony for sentencing purposes"), <u>cert. denied</u>, 510 U.S. 1048 (1994). Conversely, this case is distinguishable from the cases on which the government relies. <u>See</u>, <u>e.g.</u>, <u>United States v. Ortega</u>, 150 F.3d 937, 945–46 (8th Cir. 1998) (remanding where district court gave *no indication* whether the drug-quantity finding was based on trial evidence), <u>cert. denied</u>, 525 U.S. 1087 (1999); <u>Randolph</u>, 101 F.3d at 609 (remanding where district court gave *no explanation* for its drug-quantity finding); <u>United States v. Coleman</u>, 990 F.2d 419, 422 (8th Cir. 1993) (remanding where the district court *did not specify* which of the government's alternative theories it adopted in its drug-quantity finding); <u>United States v. Alexander</u>, 982 F.2d 262, 268 (8th Cir. 1992) (remanding where district court gave *no explanation* as to its drug-quantity finding); <u>Candie</u>, 974 F.2d at 65 (remanding where district court *failed* to credit or discredit the only drug-quantity witness's testimony).

The District Court made specific witness-credibility determinations and specifically rejected the government's proposed drug-quantity calculations. Unlike the cases remanding for additional findings, the District Court here provided much more than a conclusory statement (or no statement at all), as it considered all relevant trial testimony and made a finding that it believed was most clearly supported by the record, thereby satisfying Rule 32(i)(3)(B). We hold that the District Court's ultimate finding of drug quantity was not clearly erroneous.

## VI.

For the reasons stated, the judgment of the District Court is affirmed.

_____