# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-4184

_____

United States of America

*Plaintiff - Appellee*

v.

Juan Alatorre

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 12, 2017
Filed: July 12, 2017

_____

Before RILEY, BEAM, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Juan Alatorre entered a conditional guilty plea to the charge of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). He appeals the district court's[1] denial of his motion to suppress evidence found in plain

_____

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

view during a warrantless search of his home. Alatorre contends that the officers' "protective sweep" was unjustified because he had already been arrested and secured on the front porch leaving the arresting officers without a reasonable belief that his home harbored individuals posing a danger to them. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

Just after 6 a.m. on November 26, 2014, eight members of the Metro Area Fugitive Task Force ("Task Force") executed a warrant for Alatorre's arrest at his residence. The Task Force included Omaha police officers and United States Marshals.

Prior to leaving the police station that morning, the Task Force members attended a pre-arrest briefing where they were informed that Alatorre was being arrested because he allegedly assaulted someone with a baton outside an Omaha bar. They were also briefed on Alatorre's past criminal history, which included carrying and concealing firearms. The Task Force determined that Alatorre presented sufficient risk to their safety that use of a ballistic shield would be required during execution of the warrant. Officers later testified that the ballistic shield is used in high-risk operations where there is a history of gun violence, concealed weapons, or gang activity. The ballistic shield was described as a hand-held, solid, protective barrier measuring two-feet by four-feet and designed to stop handgun rounds.

During the arrest warrant execution, four officers approached Alatorre's front door with the ballistic shield in front in a formation designed to maximize officer safety. Other Task Force members covered the back and sides of the house. First, the officers just knocked on the door. In response, the officers testified that they heard and saw movements in the residence consistent with multiple people inside, but the officers could not tell how many people were moving around behind the closed door

and blinds. The officers also heard voices suggesting more than one person was present to participate in a conversation or hear instructions. Someone suspiciously came to the door and then retreated.

Next, the officers knocked again and announced, "Police with a warrant. Come to your door." Alatorre did not immediately respond, so the officers knocked-and-announced at least two more times after the delay. Alatorre finally opened the front door, and officers quickly placed him in handcuffs and removed him to the porch. When asked if anyone else was inside, Alatorre said, "My girlfriend." The officers could not see anyone from the front door. An officer shouted, "Anyone else inside, come to the door." The girlfriend came out of the kitchen and to the front door. She was immediately pulled outside onto the porch with the officers. She said there was no one else inside. The officers had experience with some arrestees lying to them in the past about the presence of others inside a residence.

Officers testified that the Task Force remained concerned for their safety due to uncertainty as to the number of people inside because of the noises from inside the house heard prior to the door opening, the movements minimally visible through the blinds before the door opened, the quiet voices heard inside, and the hesitancy of the occupants to open the door. Therefore, three of the officers entered the residence behind the ballistic shield to conduct a protective sweep to locate anyone else inside who could harm the arresting officers. The officers opened two closed doors immediately adjacent to the front living area and checked the rooms where a person could hide. After the living room and the two adjacent rooms were cleared, they turned to the kitchen. Two guns were visible in plain view on a shelf near the kitchen, along with ammunition, a line of white powder, a marijuana "joint," a bag of mushrooms, and other drug paraphernalia. Finding no one inside, the sweep ended after about two minutes, and the officers left the residence.

Based upon the officers' observations of guns and drugs in plain view during the protective sweep, the residence was secured, and a search warrant was obtained

for the residence. Officer Michael Dose, who was in charge of Alatorre's case but was not a member of the Task Force, conducted the search. In addition to the items seen during the protective sweep, Dose also seized a Taurus 9 millimeter handgun from beneath a couch.

Alatorre entered a conditional plea of guilty to the charge of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2), preserving his right to appeal the denial of his motion to suppress. Alatorre now appeals the denial of his motion to suppress, contending that the protective sweep was unconstitutional and that the testimony as to the observations of the entering officers and the items seized during execution of the subsequent search warrant should be suppressed as tainted fruit of an unconstitutional warrantless search.

## II. Analysis

"When considering a denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo." United States v. Davis, 457 F.3d 817, 822 (8th Cir. 2006). "We review the district court's conclusion that a protective sweep was justified de novo." United States v. Waldner, 425 F.3d 514, 517 (8th Cir. 2005).

The Fourth Amendment holds inviolate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted).

One such exception is the "protective sweep." "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the

-4-

safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). "The government bears the burden of proving that [the protective sweep] exception to the search warrant requirement applies." United States v. Green, 560 F.3d 853, 856 (8th Cir. 2009).

The Fourth Amendment permits "the protective sweep . . . if the searching officer possesse[d] a *reasonable belief* based on *specific and articulable facts* which, taken together with the *rational inferences* from those facts, reasonably warrant[ed] the officer in believing that the area swept harbored an individual posing a danger to the officer or others." Buie, 494 U.S. at 327 (alterations in original) (emphasis added) (internal quotation marks omitted) (citing Michigan v. Long, 463 U.S. 1032, 1049-1050 (1983)). "Buie authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest; Buie does not allow a protective sweep for weapons or contraband." Waldner, 425 F.3d at 517.

Alatorre contends that the Task Force's protective sweep was unreasonable because his arrest was "accomplished quickly and without incident," and he was "safely secured outside on the porch and . . . could have been immediately taken off the premises."

*A. The Officers' Reasonable Belief that Others Could be in the Residence*

Our sister circuits have often upheld protective sweeps after an arrest outside of a residence. See, e.g., United States v. Cavely, 318 F.3d 987, 995-96 (10th Cir. 2003) (finding that officers executing an arrest warrant just outside the back door of the defendant's house were justified in making a protective sweep of his house); United States v. Hoyos, 892 F.2d 1387, 1396-97 (9th Cir. 1989) (finding that narcotics officers were justified in making a protective sweep of defendant's residence after arresting him outside) (overruled on other grounds by United States

v. Ruiz, 257 F.3d 1030, 1032 (9th Cir. 2001) (en banc)). We have also found a protective sweep valid even though the defendant "had already been handcuffed and taken to [another area]." United States v. Boyd, 180 F.3d 967, 975 (8th Cir. 1999). We have likewise found a protective sweep to be reasonable in a building that did not immediately adjoin the place of arrest. United States v. Davis, 471 F.3d 938, 944-45 (8th Cir. 2006) (upholding protective sweep of defendant's barn after arrest outside of the barn). However, "[t]he inquiry as to the reasonableness and validity of a protective sweep is necessarily fact-specific." United States v. Thompson, 842 F.3d 1002, 1009 (7th Cir. 2016).

Protection of officers conducting an arrest near a defendant's home is a priority recognized by our courts. See Buie, 494 U.S. at 333. Protective sweeps in these circumstances are justified because officers are vulnerable during an arrest at a home, even when the arrestee and other occupants have been secured, as explained by Buie:

> [T]here is an . . . interest of the officers in taking steps to assure themselves that the house in which a suspect . . . has just been . . . arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. . . . A protective sweep . . . occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of an unknown configuration is more to be feared than it is in open, more familiar surroundings.

Id. We have summarized that "[a] protective sweep is justified by the threat of accomplices launching a surprise attack during an arrest and is particularly important

during an in-home arrest, due to the heightened potential for an ambush in unfamiliar surroundings." Davis, 471 F.3d at 944 (citing Buie, 494 U.S. at 333).

Here, the protective sweep of the residence was justified by several *articulable facts and rational inferences* supporting the officers' *reasonable beliefs* that someone else could be inside posing a danger to them during or following the arrest. Buie, 494 U.S. at 327. These facts and inferences include: (1) Alatorre's girlfriend lingered in the kitchen out of sight of the officers until she was specifically called to the door, indicating that it was easy for someone to hide just out of view of the officers inside the residence in a position from which an attack could be launched; (2) Guns or other dangerous weapons were conceivably present in the residence given Alatorre's criminal history involving concealed weapons and the alleged violent baton attack prompting the arrest, giving anyone remaining inside the residence access to weapons to use in an ambush of the officers; (3) The audible movements and behaviors (e.g., coming to the door and retreating; quietly conversing) of people behind the door and blinds after the officers knocked, along with the delays in answering the door, created a reasonable uncertainty as to how many people were inside the residence and their intentions toward the officers, Boyd, 180 F.3d at 975-76 (upholding a protective sweep because "[w]hen the law enforcement officers entered the house . . . they had no way of knowing how many people were there") (internal quotation marks omitted); Davis, 471 F.3d at 944 ("A protective sweep may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers."); and (4) Officers on the front porch of the residence dealing with Alatorre and his girlfriend were vulnerable to attack from someone inside the residence.

Thus, even though hindsight reveals that the officers had already encountered the only two individuals present in Alatorre's residence, the Task Force officers were justified in conducting the protective sweep of Alatorre's residence before removing him from the porch. United States v. Williams, 577 F.3d 878, 881 (8th Cir. 2009) (noting similarly that "[w]hile hindsight reveals that the officers had already

encountered all of the occupants of the home before conducting the protective sweep, that information was not apparent to the officers when they initiated the sweep").

## B. Scope and Duration of the Sweep

The Task Force conducted its protective sweep in a constitutional manner because it lasted only two minutes and was confined to places large enough to hide a person. The Supreme Court emphasized that a protective sweep "may extend only to a cursory inspection of those spaces where a person may be found." Buie, 494 U.S. at 335. We echoed Buie by specifying that a protective sweep will be upheld if it is "quick and limited" and "initially confined to places large enough to conceal a person." Boyd, 180 F.3d at 976 (internal quotation marks omitted).

Here, the Task Force's protective sweep lasted two minutes with officers only examining places where a person could be hiding, while incidentally noting guns and drugs in plain view. While conducting the protective sweep, the officers remained in formation behind the ballistic shield, confirming their continuing concern that a person lingered and searching only those areas where a person could hide. The officers opened two closed doors adjacent to the front living room and cleared them of people before proceeding. This search of the adjoining rooms was lawful because the rooms were large enough to harbor a person. Buie, 494 U.S. at 334 ("We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."). After the living room and two adjacent rooms were cleared, the officers swept through the kitchen looking in places where a person could hide. In conducting the sweep of the kitchen, the officers saw two guns, drug paraphernalia, and ammunition in plain view. The incriminating character of the drug paraphernalia—which included a marijuana joint, a bag of mushrooms, a line of white powder, among other drug paraphernalia—was immediately apparent, so it could be secured without taint. Green, 560 F.3d at 856 ("During a properly limited protective

sweep, the police may seize an item that is in plain view if its incriminating character is immediately apparent.") (internal quotation marks omitted). Finding no one inside, the sweep lasted only around two minutes, which was no more than was necessary to ensure the officers' safety. Cf. United States v. Valencia, 499 F.3d 813, 815 (8th Cir. 2007) (mentioning without comment a "two-minute protective sweep" in a case where officers checked an apartment and noticed guns and shell casings).

## III. Conclusion

Finding no clear error in the district court's factual findings, we find its conclusions of law sound. The protective sweep of Alatorre's residence passes constitutional muster, and the fruits of that valid sweep are untainted.

We affirm the district court's denial of Alatorre's motion to suppress.

_____