# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-2796
_____

United States of America

*Plaintiff - Appellee*

v.

Herbert G. Green

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: May 14, 2021
Filed: August 13, 2021
_____

Before SMITH, Chief Judge, SHEPHERD and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

Herbert G. Green twice moved to suppress evidence of guns, ammunition, and drug paraphernalia that the Kansas City police seized from his apartment. The district court denied both motions. Green conditionally pled guilty to possessing firearms in furtherance of a drug trafficking offense, *see* 18 U.S.C. § 924(c)(1)(A), (c)(1)(A)(i), and was sentenced to 60 months of imprisonment. He now appeals.

Because we conclude that the record does not contain adequate findings of fact for us to resolve Green's appeal, we remand the case to the district court for the limited purpose of making the supplemental findings of fact necessary to resolve Green's Fourth Amendment claims, while retaining jurisdiction.

## I. Background

One morning in August 2017, Detective Antonio Garcia, who had twenty-two years of experience on the police force, was working interdiction (i.e., intercepting contraband) at a Federal Express sorting center. Something he had done several thousand times before.

Under an agreement, FedEx allows the police to perform interdiction duties only between when the packages arrive (around 6:00 a.m.) and when they leave for delivery (around 8:00 a.m.). The agreement also states that officers may only seize packages when a narcotics dog ("K9") alerts to them. The K9s are not allowed near the conveyor belt where the packages move through the facility. Officers must bring flagged packages to their K9s. If the K9 does not alert to a package, the package must be immediately returned to the conveyor belt. The interdiction team cannot delay the delivery of any non-seized package.

On the morning in question, Detective Garcia began his interdiction duties around 6:00 a.m. He soon noticed a large "moving" box with a return label from Brownsville, Texas—"a source city for illegal narcotics." The box's seams were glued, which in Detective Garcia's seventeen years of interdiction experience indicates illegal narcotics "100% of the time[.]" Detective Garcia also testified that he looks at moving boxes "right away" because they are sturdy and thick, making them well suited to contain large amounts of drugs.

Detective Garcia carried the box 200 feet to the back of the FedEx facility, where his K9, Zina, immediately alerted to it. Zina is a certified narcotics dog and is "very reliable," according to Detective Garcia. Detective Garcia told FedEx about

-2-

the box and Zina's alert, filled out the necessary paperwork, and seized it. The entire process from when Detective Garcia took the box off the conveyor belt until Zina alerted took approximately three minutes. Had Zina not alerted, the box would have been returned to the conveyor belt and delivered.

Officers obtained a state search warrant for the box. They also obtained a state anticipatory warrant for the address where the box was to be delivered, which allowed the police to enter the address to retrieve the box if it was taken inside. The police then conducted a controlled delivery to the box's mailing address. A detective delivered the box to the door of the apartment, but no one was home. He left the box at the door. Approximately eight minutes later, Green arrived at the apartment while talking on the phone. Officers overheard him tell the person on the other end of the call that "the box had arrived." He then unlocked the apartment door, placed the box inside, and left the apartment building.

Officers promptly arrested Green in the parking lot a few feet from his vehicle. A tactical team then entered the apartment to ensure that they could safely execute the search warrant. The tactical team immediately saw the box just inside the doorway but proceeded to go through every room to look in any place that a person could hide. They also looked in the kitchen trashcan, kitchen cabinets, and in a shoebox located on top of Green's bedroom dresser. During the sweep, which took around ten minutes, the tactical team saw weapons and marijuana inside the apartment. Despite seeing these items in plain view, the team did not seize anything.

Detective Garcia then entered the residence, performed a walk-through, and opened the box. It contained a foam cooler, which in turn contained 24.4 pounds of marijuana. Detective Garcia took the box, its contents, and Green's cell phone back to headquarters.

The officers next obtained a federal search warrant for the apartment. When they executed the warrant, the officers recovered an AR-15 rifle from the bedroom closet, a pistol, a fully loaded magazine, three other magazines, ammunition, a

-3-

bullet-proof vest, a roll of heat-sealed bags, a digital scale, a hand-written ledger, five baggies of powder substance, one vacuum sealed bag of marijuana buds, and a shoe box with marijuana residue.

A grand jury indicted Green for attempting to possess a controlled substance with intent to distribute, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(D), 846 (Count One), possessing a firearm in furtherance of a drug trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A), (c)(1)(A)(i) (Count Two), and possessing a firearm as a felon, *see* 18 U.S.C. §§ 922(g)(1), 924(a)(2) (Count Three).

Green first moved to suppress the evidence seized from his apartment on grounds that the officers exceeded the state warrant's scope. A magistrate judge recommended denying the motion and the district court agreed. The district court then granted Green leave to challenge whether reasonable suspicion supported the seizure of the box at the FedEx facility and whether probable cause supported Green's arrest. Green also moved again to suppress the box's initial seizure and his arrest. The district court adopted the magistrate judge's recommendation and denied that motion as well.

Green then conditionally pled guilty to Count Two, reserving his right to appeal the suppression motion denials. The district court sentenced him to 60 months of imprisonment. Green now appeals, challenging the constitutionality of the box's initial seizure, his arrest, and the protective sweep.

## II. Analysis

"A mixed standard of review applies to [] denial[s] of [] motion[s] to suppress evidence." *United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015). We review the district court's findings of fact for clear error and its denials of Green's suppression motions de novo. *United States v. Smith*, 820 F.3d 356, 359–60 (8th Cir. 2016).

## A. The Package's Initial Seizure

Green first argues that a seizure occurred when Detective Garcia removed the box from the conveyor belt at a FedEx facility and took it to the back of the warehouse for Zina to sniff and that Detective Garcia lacked reasonable suspicion to support that seizure. We disagree.

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" *See United States v. Ameling*, 328 F.3d 443, 447 (8th Cir. 2003) (noting that the Fourth Amendment applies to the states through the Fourteenth Amendment). In *United States v. Va Lerie*, we held that a seizure occurs when law enforcement "meaningful[ly] interfere[s] with an individual's possessory interests in property[.]" 424 F.3d 694, 706 (8th Cir. 2005) (en banc). By implication, the meaningful-interference requirement means that "not every governmental interference with a person's property constitutes a seizure of that property under the Constitution." *Id.* at 702. *Va Lerie* involved checked luggage at a bus station but approvingly cited several cases applying the same principles to the drug-interdiction-of-mail context. *Id.* at 707–08; *see United States v. Gomez*, 312 F.3d 920, 923–24 (8th Cir. 2002) (holding no seizure occurred when a drug-interdiction officer moved a package to a command center twenty yards from a conveyor belt in a post office's sorting area); *United States v. Vasquez*, 213 F.3d 425, 426 (8th Cir. 2000) (holding no seizure occurred when drug-interdiction officers at a FedEx facility had a narcotics dog sniff a package).

In *Va Lerie*, we held that "the [meaningful-interference] seizure standard prohibits the government's conversion of an individual's private property, as opposed to the mere technical trespass to an individual's private property." 424 F.3d at 702. In fleshing out that standard, we supplied three factors courts should focus on when considering whether detaining a package constitutes a seizure: (1) whether it delayed a passenger's travel or significantly impacted the passenger's freedom of movement; (2) whether it delayed the package's timely delivery; and (3) whether it

deprived the carrier of custody of the item. *Id.* at 707. "If none of these factors is satisfied, then no Fourth Amendment seizure has occurred. Conversely, if even a single factor is satisfied, then a Fourth Amendment seizure has occurred." *Id.*

"A law enforcement officer must have reasonable suspicion that a piece of mail, or a package shipped via a commercial carrier, contains contraband to lawfully seize it for investigative purposes." *United States v. Smith*, 383 F.3d 700, 704 (8th Cir. 2004). Reasonable suspicion "is a level of suspicion 'considerably less than proof of wrongdoing by a preponderance of the evidence.' In evaluating whether suspicion is reasonable, 'we must consider the totality of the circumstances—the whole picture.' The inquiry is not 'readily . . . reduced to a neat set of legal rules.'" *United States v. Huerta*, 655 F.3d 806, 809 (8th Cir. 2011) (internal citations omitted) (quoting *United States v. Sokolow*, 490 U.S. 1, 7–8 (1989)). We have held that a K9's positive indication allows an officer to seize a package to further investigate it. *See United States v. Zacher*, 465 F.3d 336, 338 (8th Cir. 2006). In other words, if a K9 alerts to a package, then an officer has reasonable suspicion to seize that package.

So, the key question here is *when* the seizure took place. If it took place before Zina alerted to the box, the only suspicious facts that could support reasonable suspicion involve the box's appearance. On the other hand, if the seizure happened post-alert, then the reasonable-suspicion determination can include Zina's positive indication. *See, e.g.*, *Zacher*, 465 F.3d at 338 (holding a K9's positive indication supports reasonable suspicion).

Green does not argue that either of the first two *Va Lerie* factors are met. So, whether the box was seized boils down to whether the third *Va Lerie* factor is met. That is, whether Detective Garcia deprived FedEx of custody of the box by removing it from the conveyor belt and walking it 200 feet to Zina at the back of the facility. *See Va Lerie*, 424 F.3d at 707. We conclude that Detective Garcia did not deprive FedEx of custody because he was acting at FedEx's direction. Consideration of our case law reveals why.

In *Zacher*, we held that no seizure occurred when an officer placed a package on the floor at the FedEx facility for a K9 sniff. 465 F.3d at 339. We reasoned that "[n]o change in custody occurred when [the detective] placed the package on the floor, since a reasonable person could expect FedEx to handle his or her package the same way." *Id.* So, we focused on "the sender's reasonable expectations of how the carrier would handle the package" and said that those expectations "define[d] the scope of the carrier's custody." *Id.* (citing *Va Lerie*, 424 F.3d at 707 n.7). From *Zacher*, we know that an officer moving and handling a package does not automatically constitute a seizure.

In *Va Lerie*, we also applied the sender's-reasonable-expectation test to the custody question. We observed that "a commercial bus passenger who checks his luggage should reasonably expect his luggage to endure a fair amount of handling—if his luggage were not handled, it would not reach its destination." 424 F.3d at 706. In applying the test, we wrote that the officers there "removed [the passenger]'s checked luggage from the lower luggage compartment to a room inside the terminal *at* [*the bus company*]*'s request*." *Id.* at 708 (emphasis added). As a result, we concluded that "no Fourth Amendment seizure occurred." *Id.* at 708–09. The conclusion we draw from *Va Lerie* is that when officers are acting at the carrier's direction and complying with its guidance, a seizure is not likely to have occurred.

In *United States v. Alvarez-Manzo*, we concluded that officers acted outside the carrier's direction by moving a bag from the luggage compartment to the passenger compartment. 570 F.3d 1070, 1076–77 (8th Cir. 2009). We distinguished the case from *Va Lerie* by observing that the officer, "not [the bus company], was directing the action with respect to [the passenger]'s bag[.]" *Id.* at 1076. The holding in *Alvarez-Manzo* "did not turn on *where* law enforcement took the bag but *at whose direction* law enforcement acted when it did so." *Id.* at 1076. *Alvarez-Manzo* helpfully describes the holding in *Va Lerie* as well: "*Va Lerie* provides that law enforcement did not deprive [the bus company] of its custody of [the passenger]'s bag because, although law enforcement had physical possession of the bag, [*the bus company*] *was directing the action* in terms of what law enforcement

-7-

could do with [the passenger]'s bag." *Id.* (emphasis added). Reading these three cases together, it is clear that the third *Va Lerie* factor (whether the carrier was deprived of custody) turns more on *whose direction* law enforcement followed, rather than *where* the package was briefly taken.

Green disputes this conclusion, arguing that acting under the direction of the carrier means that the carrier's employee must specifically identify the parcel as suspicious. We disagree. Green's reading of *Alvarez-Manzo* does not account for *Va Lerie*'s facts. There, the carrier did not direct law enforcement *to* the suspicious luggage. 424 F.3d at 696. Instead, the opposite happened. *Id.* The carrier's "direction" in *Va Lerie* was limited to general designations about where to bring the luggage after the officer had identified it as suspicious. *Id.* at 708. *Va Lerie* is like our case because Detective Garcia identified the box as suspicious and acted at the direction of FedEx by taking the package to the location FedEx designated for K9 sniffs. Taking *Alvarez-Manzo* and *Va Lerie* together requires that we reject Green's suggestion that a carrier official must be the first to identify a parcel as suspicious. This rule would not comport with *Va Lerie* nor many cases it approvingly cited. *See, e.g.*, *United States v. Ward*, 114 F.3d 1024, 1027–28 (7th Cir. 1998) (involving law enforcement first identifying suspicious luggage); *United States v. Johnson*, 990 F.2d 1129, 1130–31 (9th Cir. 1993) (same).

We therefore hold that the third *Va Lerie* factor is not met here because when Detective Garcia briefly moved the box, he did so at FedEx's direction. This leads us to conclude that Detective Garcia did not seize the box until after Zina alerted to its contents, at which point there was clearly reasonable suspicion to support the seizure. *See Zacher*, 465 F.3d at 338 (noting a K9's positive indication is enough for reasonable suspicion).[1]

---

[1]Based on our conclusion that Detective Garcia did not seize the box when he initially removed it from the conveyor belt and carried it to the back of the facility for the K9 sniff, we need not reach the district court's alternative holding that reasonable suspicion also supported seizing the box from the outset.

## B. Green's Arrest

Green next argues that the officers lacked probable cause to arrest him after he took delivery of the box and put it inside his apartment. Again, we disagree.

Probable cause is required for a warrantless arrest. *United States v. Houston*, 548 F.3d 1151, 1154 (8th Cir. 2008). "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012) (quoting *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010)). Our precedent does not require that arresting officers witness a crime or have all the evidence needed to sustain a conviction; instead, officers only need a "probability or substantial chance of criminal activity, rather than an actual showing of criminal activity[.]" *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013); *accord United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005). "Law enforcement officers have 'substantial latitude in interpreting and *drawing inferences from* factual circumstances.'" *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (emphasis added) (quoting *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997)).

Here, Detective Garcia initially suspected that the box contained drugs because it was (1) a moving box, (2) shipped from a source city, and (3) had a glued-shut lid. Zina, a reliable drug dog, then alerted to the box. *See United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) (holding a K9 alerting to a package supports probable cause to believe drugs are present). Later, Detective Garcia witnessed Green place the box inside the apartment where it was delivered. *See United States v. Brown*, 929 F.3d 1030, 1037 (8th Cir. 2019) (holding the delivery of a drug-filled package to a specific address provided probable cause for the search of the apartment). Detective Garcia also heard Green say, "[t]he box is here" just before Green placed it inside the apartment. As the district court noted, his "familiarity with the [box] suggested he probably knew what was inside."

Green argues that the officers lacked enough information to support probable cause to arrest him.  For all they knew, Green theorizes, he could have been helping a friend by getting their mail.  But probable cause only requires showing a "substantial chance of criminal activity, rather than an actual showing of criminal activity[.]" *Winarske*, 715 F.3d at 1067.

We conclude that the box's suspicious appearance and Zina's alert, together with Green picking up the box, placing it inside the apartment, and demonstrating his familiarity with that specific box supported probable cause to arrest him.

## C.  The Protective Sweep

Green last argues that the lengthy protective sweep of his entire apartment was unconstitutional because the anticipatory warrant only authorized the officers to seize one item (the box), which they found just inside the front door.  He claims that the tactical team "saw the only item they could seize pursuant to the anticipatory warrant, chose not to seize it and exit the premises, and proceeded to walk through the entire apartment for ten to fifteen minutes looking under a mattress, in the kitchen trash can, in kitchen cabinets, and at or in a shoe box."  On this point, we agree with Green.

As usual in the Fourth Amendment context, reasonableness controls the analysis when it comes to "the method of execution of [a] warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998).  "[T]he search of a residence is generally unreasonable 'without a warrant issued on probable cause.'" *United States v. Waters*, 883 F.3d 1022, 1026 (8th Cir. 2018) (quoting *Maryland v. Buie*, 494 U.S. 325, 331 (1990)).  But "[a]n exception to the general warrant requirement of the Fourth Amendment is the protective sweep." *Id.*  A protective sweep "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.*  "During a properly limited protective sweep, the police may seize an item that is in plain view if its incriminating character is 'immediately apparent.'"

*United States v. Green*, 560 F.3d 853, 856 (8th Cir. 2009) (quoting *Horton v. California*, 496 U.S. 128, 136 (1990)).

In *Buie*, the Supreme Court addressed when and how officers may conduct a protective sweep in the context of one conducted incident to an arrest. 494 U.S. at 334. First, the Court held that, *as a matter of course*, officers may look in spaces "immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* Second, the Court held that to sweep beyond those "immediately adjoining" spaces, officers must have *reasonable suspicion* to believe dangerous individuals are hiding in the area to be swept. *Id.* at 334, n.2.

In the executing-a-search-warrant context, we have held that officers may conduct a protective sweep. *See United States v. Jones*, 471 F.3d 868, 874–75 (8th Cir. 2006). But what type of sweep can officers conduct while executing a search warrant?

Here, the district court concluded that the officers justifiably swept Green's apartment based on language in *Bailey v. United States*, 568 U.S. 186, 194 (2013). *Bailey* said that a "search for narcotics is the kind of transaction that may give rise to sudden violence[.]" 568 U.S. at 194 (quoting *Michigan v. Summers*, 452 U.S. 692, 702 (8th Cir. 1981)). In such situations, the Court said that law enforcement can "secure the premises" to "exercise unquestioned command of the situation." *Id.* at 194–95. But *Bailey* dealt with questions about law enforcement's authority to detain people both on and off the premises while executing a warrant. It did not decide when officers may execute a protective sweep incident to the execution of a search warrant.

While *Bailey* did not address that question, we did in *United States v. Waldner*, 425 F.3d 514 (8th Cir. 2005), and again in *United States v. Rodriguez*, 834 F.3d 937 (8th Cir. 2016). In *Waldner*, we stated that "*Buie* authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest; *Buie* does not allow a protective sweep for weapons or contraband." 425

F.3d at 517. And, in *Waldner*, we held that in the context of a non-arrest situation, conducting a protective sweep "requires a showing of a reasonable suspicion of dangerous individuals in the house." *Id.* We reaffirmed the rule from *Waldner* in *Rodriguez*. *Rodriguez*, 834 F.3d at 942 ("[A] protective sweep in the absence of an arrest or reasonable suspicion of dangerous individuals was clearly illegal under *Waldner*."). Here, just like in *Waldner* and *Rodriguez*, we are dealing with a protective sweep in the context of a non-arrest situation (i.e., executing a search warrant).[2]

The government tries to distinguish *Waldner* and *Rodriguez* because the former involved serving a protective order and the latter involved entering a house with consent. But *Waldner* and *Rodriguez* are clear: In a non-arrest context, a protective sweep requires reasonable suspicion of dangerous individuals inside from the outset. *See Waldner*, 425 F.3d at 517; *Rodriguez*, 834 F.3d at 942. Because the government does not argue that the officers had reasonable suspicion to believe that dangerous individuals were present in Green's apartment *before* they began the protective sweep, we conclude that the protective sweep of Green's apartment violated the Fourth Amendment.

Even assuming a protective sweep of Green's apartment was valid, the scope of the sweep here also violated the Constitution. The Supreme Court has held that a protective sweep "may extend only to a cursory inspection of those spaces where a person may be found." *Buie*, 494 U.S. at 335. A protective sweep must be "quick

---

[2]The government does not argue that Green's arrest outside the apartment justified a protective sweep of his apartment. Even so, we note that the government would need to point to "*articulable facts and rational inferences* supporting the officers' *reasonable beliefs* that someone else could be inside posing a danger to them during or following the arrest." *United States v. Alatorre*, 863 F.3d 810, 814–15 (8th Cir. 2017) (holding a protective sweep of a residence was justified after officers removed the arrestee to the porch where there were specific facts indicating the clear possibility that dangerous individuals and weapons were inside). The government did not point us to any such facts, beyond the general drug context, here.

and limited" and "initially confined to places large enough to conceal a person." *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999) (quoting *Buie*, 494 U.S. at 327); *see Alatorre*, 863 F.3d at 815 (holding a task force conducted a constitutional protective sweep "because it lasted only two minutes and was confined to places large enough to hide a person"). Here, a team of officers performed a "sweep" of Green's apartment that lasted around ten minutes and included looking inside kitchen cupboards, trash cans, and even inside a shoebox. This exhaustive search far exceeded the permissible bounds of a protective sweep both in the time it took for a team of officers to "sweep" the apartment and the places that were searched. *Cf. United States v. Thompson*, 2021 WL 3136048, at \*1, \*3 (8th Cir. July 26, 2021) (holding the sweep of a house was justified where the suspicious conduct of people inside and the defendant's criminal history involving concealed weapons supported the officers' reasonable suspicion that dangerous individuals were present in the home). We therefore conclude that, even if a protective sweep of Green's apartment was valid, the scope of the sweep violated the Fourth Amendment.

## D.  Independent Source Doctrine

Considering our conclusion that the protective sweep of Green's apartment violated the Constitution, we next ask whether an exception to the exclusionary rule applies. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (laying out multiple exceptions to the exclusionary rule); *see also Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence . . . has always been [a] last resort, not [the] first impulse."). The government argues that the independent source doctrine works to prevent exclusion here.[3]

---

[3]While the district court did not rely on the independent source doctrine below, "[w]e may affirm the district court's denial of a motion to suppress on any ground the record supports." *United States v. Murillo-Salgado*, 854 F.3d 407, 414 (8th Cir. 2017) (quotation omitted); *see, e.g.*, *United States v. Perez-Trevino*, 891 F.3d 359, 367 (8th Cir. 2018) (affirming the denial of a motion to suppress on a different ground than the district court); *United States v. Brandwein*, 796 F.3d 980, 984 (8th Cir. 2015) (same).

"The independent source doctrine allows admission of 'evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality.'" *United States v. Anguiano*, 934 F.3d 871, 874 (8th Cir. 2019) (quoting *Murray v. United States*, 487 U.S. 533, 537 (1988)); *see Strieff*, 136 S. Ct. at 2061. To invoke the doctrine, the government must show "(1) that the decision to seek the warrant was *independent* of the unlawful entry—i.e., that police would have sought the warrant even if the initial entry had not occurred—and (2) that the information obtained through the unlawful entry *did not affect* the magistrate's decision to issue the warrant." *United States v. Khabeer*, 410 F.3d 477, 483 (8th Cir. 2005) (emphasis added); *accord United States v. Swope*, 542 F.3d 609, 613–14 (8th Cir. 2008).

Here, there is an argument that the independent source doctrine applies. Apart from the protective sweep, the officers would still have discovered that, as suspected, the box contained drugs. And the officers saw Green place the box inside the apartment after indicating that he recognized it. So, there was clear evidence associating a box containing drugs with the apartment. Even without the protective sweep, then, the officers may have obtained a warrant to search Green's apartment. *See Swope*, 542 F.3d at 615 (holding a search warrant obtained after an unlawful

---

The government also argues that the good-faith exception to the exclusionary rule applies. *See United States v. Leon*, 468 U.S. 897, 920–21 (1984) ("[W]hen an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . . there is no police illegality and thus nothing to deter."); *see also United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) ("For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, the detectives' prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997))). But the good-faith exception does not apply here because the scope of the protective sweep—a ten-minute long exhaustive search of every nook and cranny of Green's apartment—was clearly illegal under our precedent. *See, e.g.*, *Boyd*, 180 F.3d at 976 (holding a protective sweep must be "quick and limited" and "initially confined to places large enough to conceal a person").

search was an independent source for physical evidence because the officers' decision to seek the warrant did not depend on the unlawful search and the redacted warrant application still supported probable cause); *United States v. Craig*, 630 F.3d 717, 722 (8th Cir. 2011) (same).

But just like in *Khabeer*, we must remand so that the district court has an opportunity to "explicitly find" whether "the agents would have sought a warrant if they had not earlier" conducted a lengthy protective sweep of Green's apartment. 410 F.3d at 484 (quoting *Murray*, 487 U.S. at 543 ("[I]t is the function of the [d]istrict [c]ourt rather than the [c]ourt of [a]ppeals to determine the facts" and concluding that the possible inferences to be drawn from the record are not "clear enough to justify the conclusion that the [d]istrict [c]ourt's findings amounted to a determination of independent source.")).

## III. Conclusion

For these reasons, we retain jurisdiction over this appeal, but remand to the district court for the limited purpose of making findings of fact as to whether the officers' decision to seek a search warrant for Green's apartment was prompted by what the officers observed when they conducted their protective sweep.

_____